# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-CT-02093-SCT

*MERIDIAN PROFESSIONAL BASEBALL CLUB*

*AND LIBERTY MUTUAL INSURANCE COMPANY*

*v.*

*BLAIR JENSEN*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 11/15/1999 |
| TRIAL JUDGE: | HON. ROBERT WALTER BAILEY |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | DONALD V. BURCH |
| | JOHN S. GONZALEZ |
| ATTORNEY FOR APPELLEE: | KEVIN LEWIS |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | AFFIRMED - 10/10/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/31/2002 |

**EN BANC.**

**COBB, JUSTICE, FOR THE COURT:**

¶1. At issue in this appeal is the amount of workers' compensation benefits due an employee for partial loss of use of his arm. We granted certiorari because the case requires a reconsideration of the proof required in compensation cases of this nature. We affirm the judgments of the Commission and the Court of Appeals and explore how such claims should be examined.

## FACTS

¶2. Blair Jensen suffered an injury to his left arm while employed as a professional baseball player for the Meridian Brakemen. Jensen at the time was a twenty-one-year-old high school graduate, who between baseball seasons had worked as a sports coach, construction worker and produce packer. His average weekly wage at the time of the injury was $187.50. After the injury he worked a variety of part-time jobs while going to school. By the time of his hearing for workers' compensation, Jensen was working full time at a medical clinic and making approximately $320 a week, while continuing his education as a junior at Fresno State University.

¶3. Jensen sought workers' compensation benefits for full occupational loss of his left arm. By medical opinion, Jensen's arm was only 7% functionally impaired after maximum recovery, but the opinion further stated that Jensen would be unable to return to "his usual profession as a baseball catcher" and should be permanently restricted from work requiring repetitive overhead lifting.

¶4. At his administrative hearing, Jensen offered his medical proof and also his own testimony. He testified that his injured arm restricted him somewhat in his current work and recreational activities. The administrative judge found by "the evidence as a whole" that, although Jensen could no longer play professional baseball, "he can earn as much or more working part time while going to college than he was earning as a baseball player at the time of the injury." Notwithstanding this wage-earning capacity, the AJ awarded benefits for a 25% occupational loss of use of Jensen's left arm. The full Commission affirmed, and the case has proceeded on appeal.

¶5. The Lauderdale County Circuit Court ruled in Jensen's favor in the initial appeal. The circuit court found the law to be that total loss of use to a scheduled member occurs when a claimant is unable to perform the "substantial acts of his usual employment" and that "usual employment" refers to a claimant's job at the time of injury.

¶6. The Court of Appeals reversed the circuit court's judgment and reinstated the order of the Commission. That court found that, while the Commission must look to the evidence to determine if the claimant could still perform the substantial acts of his usual employment, the phrase "usual employment" has a broader meaning than the job at the time of injury. The Court of Appeals found that Jensen's recent jobs, activities and education constituted substantial evidence to support the Commission's finding of less than a total loss of use.

¶7. Jensen contends that he is entitled to benefits commensurate with full occupational loss of his arm, because the focus should be on partial "loss of use" under the applicable statute, and precedent establishes he is so entitled because his injury prevents him from performing the substantial acts of his "usual employment," i.e., baseball player. His employer argues that the determination should be made from the evidence as a whole and that the claimant's wage-earning ability after the injury should be considered.

## STANDARD OF REVIEW

¶8. This Court will overturn the Workers' Compensation Commission decision only for an error of law or an unsupported finding of fact. *Georgia Pac. Corp. v. Taplin*, 586 So. 2d 823, 826 (Miss. 1991). Reversal is proper only when a Commission order is not based on substantial evidence, is arbitrary or capricious, or is based on an erroneous application of the law. *Smith v. Jackson Constr. Co.*, 607 So. 2d 1119, 1124 (Miss. 1992).

## DISCUSSION

### DID THE COURT OF APPEALS' DECISION CONFLICT WITH PRIOR APPELLATE DECISIONS IN ITS DEFINITION OF "USUAL EMPLOYMENT" WITHIN THE "SUBSTANTIAL ACTS OF USUAL EMPLOYMENT" TEST?

¶9. Although the most applicable section of the Workers' Compensation Law, Miss. Code Ann. §§ 71-3-1 to -129 (2000 & Supp. 2002), is § 71-3-17(c)(22)-(23), for purposes of comparison it is helpful to view that section in context with the other sections shown below. The applicable statute defines disability as follows:

Unless the context otherwise requires, the definitions which follow govern the construction and meaning of the terms used in this chapter:

. . . .

(i) "Disability" means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings.

Miss. Code Ann. § 71-3-3 (2000).

Compensation for disability shall be paid to the employee as follows:

. . . .

(c) Permanent partial disability: In case of disability partial in character but permanent in quality, . . . 66-2/3% . . . of the average weekly wages of the injured employee, subject to the maximum limitations as to weekly benefits as set up in this chapter, which shall be paid following compensation for temporary total disability paid in accordance with subsection (b) of this section, and shall be paid to the employee as follows:

| Member Lost | Number Weeks Compensation |
| --- | --- |
| (1) Arm | 200 |

. . . .

(22) Total loss of use: Compensation for permanent total loss of use of a member shall be the same as for loss of the member.

(23) Partial loss or partial loss of use: Compensation for permanent partial loss or loss of use of a member may be for proportionate loss or loss of use of the member.

. . . .

(25) Other cases: In all other cases in this class of disability, the compensation shall be . . . 66-2/3 % . . . of the difference between his average weekly wages, subject to the maximum limitations as to weekly benefits as set up in this chapter, and his wage-earning capacity thereafter in the same

employment or otherwise, payable during the continuance of such partial disability, but subject to reconsideration of the degree of such impairment by the commission on its own motion or upon application of any party in interest. Such payments shall in no case be made for a longer period than four hundred fifty (450) weeks.

. . . .

*Id.* § 71-3-17.

¶10. Early in the history of the Workers' Compensation Law, this Court recognized that the act should be given a broad and liberal construction as to both individual cases and the laws that govern them. ***L.B. Priester & Son, Inc. v. Bynum's Dependents***, 244 Miss. 185, 197-98, 142 So. 2d 30, 31 (1962). Doubtful cases are to be resolved in favor of compensation so that the beneficial purposes of the act may be achieved. ***[Miss. Transp. Comm'n v. Dewease](#)***, 691 So. 2d 1007, 1016 (Miss. 1997); ***Robinson v. Packard Elec. Div., Gen. Motors Corp.***, 523 So. 2d 329, 332 (Miss. 1988); ***Nat'l Sur. Corp. v. Kemp***, 217 Miss. 537, 543, 64 So. 2d 723, 725 (1953); ***Lucedale Veneer Co. v. Rogers***, 211 Miss. 613, 622, 48 So. 2d 148, 150 (1950).

¶11. We are aided in our construction of statutes by definitions provided by the act, such as the definition above for "disability." The courts have added other definitions to implement application of the compensation law. "Functional" or "medical" loss refers to physical impairment. "Industrial" or "occupational" loss is "the functional or medical disability as it affects the claimant's ability to perform the duties of employment." ***McGowan v. Orleans Furniture, Inc.***, 586 So. 2d 163, 166 (Miss. 1991) (quoting ***Robinson***, 523 So. 2d at 331). Recognizing the distinction between a functional and an occupational loss is essential to the correct legal resolution of the present case.

¶12. This is a permanent-loss, scheduled-member, workers' compensation case. The focus in this case is narrowly upon the extent of benefits Jensen can be awarded for permanent partial functional loss to his arm, a part of the body listed or "scheduled" under § 71-3-17(c). This case is not concerned with total loss (such as an amputated arm), or total loss of use (such as a paralyzed arm), for which maximum scheduled benefits are available. Workers are entitled to be compensated for total loss or total loss of use of a scheduled member in accordance with the number of weeks provided by statute. Jensen did not claim total occupational disability, so the total disability statute is not directly in play.

¶13. Although the loss of a member might have no impact on the worker's ability to perform his job, the statute nevertheless provides a rigid formula for compensation. This imprecision reflects a legislative preference for certainty over extended litigation in scheduled-member cases. ***Walker Mfg. Co. v. Cantrell***, 577 So. 2d 1243, 1247 (Miss. 1991). "[T]he Act arbitrarily schedules the compensation payable for loss of or loss of use of a scheduled member, *focusing upon a claimant's functional [i.e., medical] loss and without regard to loss of wage earning capacity.*" ***Smith v. Jackson Constr. Co.***, 607 So. 2d 1119, 1126 (Miss. 1992) (emphasis added). That is, where the claim is based solely on the medical or functional disability, no evidence need be supplied as to loss of ability to work. "However, in some cases, *despite* a partial *functional* loss of a scheduled member, the claimant's *industrial or occupational* disability or *loss of wage earning capacity* controls his degree of disability." ***Id.*** (emphasis added). That is, it will sometimes be the case that evidence of a greater occupational disability than would be indicated by the medical evidence alone will justify a higher disability rating, in which case relief is awarded that goes beyond the arbitrary provisions of the schedule.

¶14. A worker suffering a scheduled member injury is thus entitled to the higher of the two types of losses, functional or occupational, in the event of a variance in the two.[1] If, for example, Jensen had suffered an arm injury which translated to a 25% occupational loss and claimed no more than that, but was also a 40% functional loss, he would be entitled to benefits based on the 40% functional loss. *Cantrell*, 577 So. 2d at 1247-48.

¶15. The Commission determined that, although Jensen suffered only a 7% functional loss, he experienced a 25% occupational loss. He would thus be entitled to receive 2/3 of his average weekly wage for 50 weeks, with the length of benefits being determined as the product of his 25% occupational loss multiplied by the maximum of 200 weeks of compensation available under the schedule. *Smith*, 607 So. 2d at 1126.

¶16. This Court has determined through a line of cases that maximum scheduled benefits should be awarded where the injury prevents the worker from performing the "substantial acts of his usual employment." In other words, the worker was found to have suffered a total occupational loss of a member if a partial functional loss resulted in inability to perform the substantial acts of his usual employment. *McGowan*, 586 So. 2d at 166-68; *Piggly Wiggly v. Houston*, 464 So. 2d 510, 512-13 (Miss. 1985); *Richey v. City of Tupelo*, 361 So. 2d 995, 997-98 (Miss. 1978); *Bill Williams Feed Serv. v. Mangum*, 183 So. 2d 917, 920 (Miss. 1966); *McManus v. S. United Ice Co.*, 243 Miss. 576, 584, 138 So. 2d 899, 901 (1962); *Tyler v. Oden Constr. Co.*, 241 Miss. 270, 273, 130 So. 2d 552, 553 (1961); *Modern Laundry v. Williams*, 224 Miss. 174, 179-80, 79 So. 2d 829, 832 (1955); *Lucedale Veneer Co. v. Keel*, 223 Miss. 821, 827, 79 So. 2d 233, 236 (1955); *M.T. Reed Constr. Co. v. Martin*, 215 Miss. 472, 478, 61 So. 2d 300, 303 (1952), *overruled on other grounds by Smith*, 607 So. 2d at 1128.

¶17. *Smith v. Jackson Construction Co.* changed the landscape of the law in scheduled-member cases. There, a claimant with an eighth-grade education, who was skilled only in manual labor, suffered a leg injury and could find no work as a result. *Smith*, 607 So. 2d at 1128. The Commission found Smith had suffered a 30% permanent partial disability to his leg. *Id.* at 1125. Reversing precedents, this Court held that if functional loss of use of a scheduled member results in permanent and total occupational disability, or permanent loss of wage-earning capacity, the claimant is entitled to compensation on that basis under § 71-3-17(a), the permanent total disability statute. *Id.* at 1127-28. Smith, if totally occupationally disabled, was therefore entitled to 450 weeks of total disability benefits instead of the 175 weeks scheduled for a leg injury. *Id.* at 1128. This Court held that scheduled-member restrictions are inapplicable in such circumstances, because § 71-3-17(c) covers only permanent partial occupational loss. *Id.*

¶18. In many of the pre-*Smith* cases, it appears that a claim for permanent total disability could have been made. In *M.T. Reed*, a 59-year-old lifelong carpenter was unlikely to be able to pursue any other work after a leg injury. In *Keel*, a 51-year-old who had always earned his living as a manual laborer could not find such a job after an arm injury. In *Williams*, a 34-year-old laundry worker, whose only other experience was in truck driving and road construction, could no longer obtain employment in any field of prior experience after an arm injury. In *Tyler*, a 63-year-old man who had done construction work for fifteen years was unable to do any kind of work after a leg injury. In *McManus*, a 63-year-old ice-house worker with a fourth-grade education was entitled to full scheduled benefits for an injury to his arm. In *Mangum*, a 57-year-old man was unable to work as a feed mill employee after an injury to his leg forced him to walk with a cane. In *McGowan*, a 43-year-old man with a tenth-grade education, skilled only in construction and

carpentry, would have been forced to "look hard" to find sedentary work after his leg injury.

¶19. This is not to say that **Smith** overruled the **M.T. Reed** line of cases with regard to the "substantial acts of usual employment" test for total occupational loss of a scheduled member. We have little doubt that the doctrine is rooted in the principle that the workers' compensation law should be given a broad and liberal construction in view of the beneficial purposes. But scheduled-member cases decided prior to **Smith** must be read with the understanding that this Court had yet not removed an erroneous statutory construction which prevented total disability benefits for injuries to scheduled members. A closer look at the substantial acts doctrine is now required by Jensen's claim.

¶20. Our primary concern is whether "the job at the time of injury" is necessarily the "usual employment." The cases clearly indicate otherwise.[2] In **Williams**, this Court considered the claimant's fitness for all his former jobs. In **Piggly Wiggly**, the claimant testified to twenty years of employment history. In **McGowan**, this Court looked to the claimant's jobs in the past. In short, "usual employment" is broader in scope than the job held at the time of the injury, and narrower than "other employment" as contained in § 71-3-3(i). Usual employment in this context means the jobs in which the claimant has past experience, jobs requiring similar skills, or jobs for which the worker is otherwise suited by his age, education, experience, and any other relevant factual criteria.

¶21. Therefore, where a permanent partial disability renders a worker unable to continue in the position held at the time of injury, we hold that such inability creates a rebuttable presumption of total occupational loss of the member, subject to other proof of the claimant's ability to earn the same wages which the claimant was receiving at the time of injury. The presumption arises when the claimant establishes that he has made a reasonable effort but has been unable to find work in his usual employment, or makes other proof of his inability to perform the substantial acts of his usual employment. Rebuttal is shown by all the evidence concerning wage-earning capacity, including education and training which the claimant has had, his age, continuance of pain, and any other related circumstances. We find support for this holding in the same cases which created the substantial acts doctrine and which indicate that the ultimate determination must be made from the evidence as a whole considering loss of wage-earning capacity. *See, e.g., McGowan*, 586 So. 2d at 167.

¶22. There is no conflict here with **Smith**, which holds "that loss of *industrial* use of a scheduled member is analyzed 'without regard to loss of wage-earning capacity.' " **Smith**, 607 So. 2d at 1126 (emphasis added) . Any apparent conflict is removed when the language from **Smith** is quoted more fully, as we did above: "the Act arbitrarily schedules the compensation payable for loss of or loss of use of a scheduled member, focusing upon a claimant's *functional* loss and without regard to loss of wage earning capacity." (emphasis added). We have already noted that in this context, "functional" and "medical" are synonymous. Where functional or medical loss is the measure, wage-earning capacity does not enter in; but that is not the issue before this Court in Jensen's case, where the previously-quoted language from **Smith** becomes relevant: "in some cases, *despite* a partial *functional* loss of a scheduled member, the claimant's *industrial or occupational* disability or *loss of wage earning capacity* controls his degree of disability." **Smith**, 607 So. 2d at 1126 (emphasis added).[3]

¶23. Jensen also argues that **McGowan** "must be overruled" if usual employment in the occupational-disability context is construed "to include new types of jobs the claimant may train himself for." But as the concurrence to the Court of Appeals' opinion in the case sub judice demonstrates, **McGowan** can easily be

read in a fashion consistent with *Walker Manufacturing Co. v. Cantrell* and similar opinions:

> Though *McGowan* and *Walker Mfg.* could be viewed as inconsistent on the need to show a failed effort to search for other work, they fit together coherently if the statement in *Walker Mfg.* that such a claimant must seek other work is moderated. What in essence both mean is that when a claimant seeks benefits based on an enhanced occupational effect of an injury to a scheduled member, *a variety of evidence is relevant* to whether in fact the claimant is unable to perform the substantial acts of the employment. I find that *Walker Mfg.* sustains the view expressed here, that a worker making this claim must convince the Commission that employment *comparable to his occupation prior to the time of injury* was no longer attainable. He might not have to prove that he actually looked since that is what *McGowan* said was unnecessary. Yet he must present relevant evidence that he could not perform the jobs within his normal occupation--or occupations. That in turn can be countered by relevant evidence discrediting his factual assertions

*Meridian Prof'l Baseball Club v. Jensen*, No. 1999-WC-02098-COA, at ¶ 37 (Miss. Ct. App. Oct. 10, 2000) (Southwick, P.J., concurring) (emphasis added). "Comparable" here would mean comparable in terms of what workers' compensation is principally intended to remedy, the loss of wage-earning capacity.

¶24. We have already noted the importance of fulfilling the act's beneficial purpose. This Court's resolution of this issue recognizes that the purpose behind the Workers' Compensation Law is to share amongst workers, employers, and consumers the burden of supporting those whose ability to work is seriously diminished or eliminated. *See, e.g.,* Miss. Code Ann. § 71-3-1 (2000); *Prentiss Truck & Tractor Co. v. Spencer*, 228 Miss. 66, 83-84, 87 So. 2d 272, 277-78 (1956) (quoting *Whitehead v. Keene Roofing Co.*, 43 So. 2d 464, 465 (Fla. 1949)); *Stanley v. McLendon*, 220 Miss. 192, 198, 70 So. 2d 323, 326 (1954); *M.T. Reed*, 215 Miss. at 483, 63 So. 2d at 532 ("purpose of the workmen's compensation law to provide a substitute for lost wages and earning capacity"). It aims at "rehabilitation and restoration to health and vocational opportunity," *McCluskey v. Thompson*, 363 So. 2d 256, 259 (Miss. 1978), rather than the full range of remedies available at common law. For this Court to award those benefits which are meant to compensate for an inability to work, even though the worker in fact is able to secure employment at a comparable or even greater salary, would bestow a windfall contrary to the specific beneficial and remedial purpose of workers' compensation. *Shumway v. Albany Port Tavern, Inc.*, 546 N.Y.S.2d 200, 201 (N.Y. App. Div. 1989) (contrasting "windfall" with "social welfare purposes of workers' compensation"); *cf. O'Brien v. W.C.A.B. (City of Philadelphia)*, 780 A.2d 829, 834-35 (Pa. Commw. Ct. 2001); *Geigy Chem. Corp. v. Zuckerman*, 261 A.2d 844, 848-49 (R.I. 1970).

¶25. Application of this opinion's analysis to Jensen's claim indicates that he established, or very nearly established, that he could no longer perform the substantial acts of his actual employment at the time of his injury. But Jensen's claim for benefits for total occupational loss of his arm must fail, on these facts, because of the Commission's finding, supported by substantial evidence, that Jensen suffered only a 25% occupational loss of use of the arm. That finding is supported by Jensen's work history, including his youth, his education, and the jobs held after his injury, which together[4] demonstrated no loss of wage-earning capacity. Certainly, this Court regrets the untimely curtailment of Jensen's aspirations to make his career in playing professional baseball. Nevertheless, workers' compensation was not intended, and cannot serve, as a remedy for lost hopes and dreams.

¶26. Because the judgment of the Court of Appeals can thus be affirmed without addressing that opinion's

foray into the application of workers' compensation law to professional athletes, this Court will not address any issues arising therefrom.

## CONCLUSION

¶27. Where the occupational disability due to permanent partial loss of use of a scheduled member exceeds the functional or medical loss, the AJ and the Commission properly look to the entire factual context to determine whether total occupational loss has occurred. This necessarily goes beyond a literalistic interpretation of the "usual employment" test as applying solely to the job held at the time of the injury, regardless of the broader context. Common sense, our case law, and the policy behind the Workers' Compensation Law all support the holding that loss of wage-earning capacity is a factor in whether or not occupational disability is greater than the medical loss of use would indicate.

¶28. For all the reasons stated in this opinion, the judgment of the Court of Appeals is affirmed.

¶29. **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED.**

**PITTMAN, C.J., SMITH, P.J., WALLER AND CARLSON, JJ., CONCUR. EASLEY, J., CONCURS IN RESULT ONLY. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶30. I agree with the circuit court's interpretation of our case law which finds that total loss of use of a scheduled member is established by proof that, as a result of the injury, the claimant is totally unable to perform the substantial acts of his usual employment. *Smith v. Jackson Constr. Co.,* 607 So.2d 1119 (Miss. 1992); *McGowan v. Orleans Furniture, Inc*., 586 So.2d 163 (Miss. 1991); *M.T. Reed Constr. Co. v. Martin*, 215 Miss. 472, 61 So.2d 300 (1952); *Cook v. President Casino*, 740 So.2d 963 (Miss. Ct. App.1999). Further, I agree with the circuit court that as a matter of law the phrase "usual employment" refers to the type of job the claimant was performing when injured. Therefore, I would reverse the Court of Appeals and affirm the circuit court's judgment in toto. Accordingly, I respectfully dissent.

¶31. The Workers' Compensation Commission found that Blair Jensen's injury totally disabled him from playing baseball, the job he was performing when injured and his intended career. Therefore, he was totally disabled from his usual employment and is entitled to an award for total loss of use of his left arm.

¶32. In its overview the majority recognizes that our worker's compensation statutes should be given broad and liberal construction as to both individual cases and the laws that govern them. *L.B. Priester & Son, Inc. v. Bynum's Dependents*, 244 Miss. 185, 197-98, 142 So. 2d 30, 31 (1962). However, the majority fails to apply that precept to the case at hand and instead analyzes this case very narrowly, an approach which cannot logically be reconciled with a similar approach to other of the enumerated members listed in Miss. Code Ann.§ 71-3-17 (c) (2000), which reads in pertinent part as follows:

(c) Permanent partial disability: In case of disability partial in character but permanent in quality, the compensation shall be sixty-six and two-thirds percent (66-*2/3%*) of the average weekly wages of the injured employee, subject to the maximum limitations as to weekly benefits as set up in this chapter, which shall be paid following compensation for temporary total disability paid in accordance with

subsection (b) of this section, and shall be paid to the employee as follows:

| Member Lost | Number Weeks Compensation | Member Lost | Number Weeks Compensation |
|---|---|---|---|
| (1) Arm | 200 | (9) Second Finger | 30 |
| (2) Leg | 175 | (10) Third Finger | 20 |
| (3) Hand | 150 | (11) Toe other than great toe | 10 |
| (4) Foot | 125 | (12) Fourth Finger | 15 |
| (5) Eye | 100 | (13) Testicle, one | 50 |
| (6) Thumb | 60 | (14) Testicle, both | 150 |
| (7) First Finger | 35 | (15) Breast, female, one | 50 |
| (8) Great Toe | 30 | (16) Breast, female, both | 150 |

¶33. The majority, following the Court of Appeals, decides that these scheduled members would have to be considered for permanent injuries under the *industrial or occupational* definitions and not the medical or functional definition given by a doctor as to loss of use. Thus, the industrial or occupational function is applied when there is a total loss.

¶34. Consider the majority's and the Court of Appeals' interpretations: apply the industrial or occupational disability analysis to the loss of use of another scheduled member, say, a breast or testicle. A claimant is entitled to up to 50 weeks of wage compensation for lost use of either. But I know of no employment for which a claimant would be able to claim occupational loss wage compensation under the majority's given analysis. The majority rules that "[a] worker suffering a scheduled member injury is thus entitled to the higher of the two types of losses, functional or occupational, in the event of a variance in the two." This rule cannot apply to *all* of the scheduled members.

¶35. What the majority fails to recognize is that with scheduled members, the "usual employment" test is applied and using that definition, as the circuit court did, the focus becomes whether a claimant, like Jensen, is entitled to the maximum weeks for the permanent injury or disability. If there is no permanent medical disability, the number of weeks that a scheduled member is permitted as shown by the doctor should be applied. Again, how does one conclude, under the majority's analysis, that *all* scheduled members can be covered? One cannot.

¶36. Here, the usual employment as defined by the circuit court should be applicable in this case, and Jensen should get the maximum number of weeks. The majority uses the standard that would be applicable only to a total disability with a full body application of whether someone is permanently disabled. *See McGowan*, 586 So.2d at 166-68.

¶37. Also, if a professional pianist loses eight of his fingers, he would not be able to play the piano, and he would be totally disabled. He may be able to perform other jobs, but he would not be able to play the piano. This is what it comes down to with scheduled members; the claimant may be able to do other jobs if a scheduled member is permanently injured, but he would only be entitled to the number of weeks that are allowed for the scheduled member, in this case 200 weeks.

¶38. After reading the majority opinion, one can only wonder how the majority's analysis would apply to the loss of other scheduled members. How would a claimant get permanent disability using the analysis employed by the majority and Court of Appeals? It does not create in anyway a disability to a legitimate occupation or employment that this writer can conceive. The approach adopted by the majority and the Court of Appeals would be irrational if applied to *all* scheduled members.

¶39. The string of cases that the majority discusses finally found that the language of the statute shows that there are times when injury or loss of a scheduled member entitle a claimant to the maximum number of weeks allowed. However, if that injury rendered the person completely functionally or industrially disabled from his occupation then the 450 weeks would apply. Otherwise, the 200 weeks would apply. In this case, Jensen can perform other jobs. The circuit court got it right by simply stating that because of his usual employment, he can never be a baseball player. Yes, he may be able to perform some other work not proven by the employer and carrier, but he cannot be a professional baseball player ever again. He is entitled to the maximum of 200 weeks total disability.

¶40. The majority decides that there is a conflict with *Smith*, and the loss of industrial use of a scheduled member is analyzed without regard to loss of wage earning capacity. But then the majority says that the conflict is removed when *Smith* is quoted more fully. If that is the case, one can only wonder how to apply the analysis to the loss of other scheduled members, since, for some of them, there would be no industrial loss of use.

¶41. The circuit court got it right, and I would affirm its judgment in toto. For these reasons, I respectfully dissent.

**DIAZ, J., JOINS THIS OPINION.**

1. We therefore find it difficult to understand the dissenting opinion's contention that we "decide[ ] that . . . scheduled members would have to be considered for permanent injuries under the *industrial or occupational* definitions and not the medical or functional definition given by a doctor as to loss of use." Dissent at ¶ 33. Take one of the dissent's examples, loss of use of a testicle: a 100% medical impairment would result in 100% of the scheduled benefits for that organ. If, however, the testicle were only 50% impaired medically, but for some reason caused a 100% industrial loss of use, then the claimant might be entitled to 100% benefits rather than 50%, provided (as detailed *infra*) that his employer were unable to rebut the presumption that his impairment left him unable to earn comparable wages at some other occupation requiring less testicular fortitude.

The dissent's author "know[s] of no employment for which a [testicularly impaired] claimant would be able to claim occupational loss wage compensation" under our analysis. Dissent at ¶ 34. That is simply irrelevant. As his examples suggest, no one ever intended that every scheduled member would necessarily offer the prospect of heightened occupational loss above and beyond the medical loss. Our procedure preserves the beneficial interpretation of the Workers' Compensation Law in *M.T. Reed* and *Smith* without creating an undeserved windfall for those who, while prevented from pursuing their same line of work, are not economically impaired by the transition to another occupation.

2. In addressing this issue, the Court acknowledges that the Court of Appeals has gone both ways on this question, with many erudite opinions (including concurrences and dissents) that have been of service to us in deciding the present case. *See, e.g., [Ard v. Marshall Durbin Cos.](#)*, 818 So. 2d 1240 (Miss. Ct. App. June 11, 2002); *Weatherspoon v. Croft Metals, Inc.*, 2000-WC-01411-COA (Miss. Ct. App. Jan. 22, 2002); *[Good Earth Dev., Inc. v. Rogers](#)*, 800 So. 2d 1164 (Miss. Ct. App. 2001); *[Robinette v. Henry I. Siegal Co.](#)*, 801 So. 2d 739 (Miss. Ct. App. 2000); *[Cook v. President Casino](#)*, 740 So. 2d 963 (Miss. Ct. App. 1999). The flexibility of the Court of Appeals demonstrates the importance of our clearly resolving this question.

3. The importance of attending to this distinction is illustrated by the Court of Appeals' opinion in *Weatherspoon v. Croft Metals, Inc.*, where the same language in *Smith* is similarly cited for the proposition that "the award is based solely on the degree of disability to the scheduled member and does not take into account the effect of that disability on the claimant's actual ability to earn wages in her post-injury condition." This (functional) "disability" has somehow changed into "industrial loss" by the following paragraph. *See Weatherspoon* at ¶¶ 8-9. Moreover, the Court of Appeals' holding in *Weatherspoon* that, because the claimant could no longer perform the tasks of her previous job, "no further inquiry is required," contradicts its own holding in the opinion sub judice and the precedents of this Court discussed above.

4. Jensen claims that the dissenting opinion in *Weatherspoon* proves a ten-judge consensus to abandon the opinion sub judice; this claim rests on the dissent's statement that "the Commission erred in focusing *entirely* on Weatherspoon's post-injury efforts to seek other employment to determine the extent of her industrial injury." *Weatherspoon* at ¶ 23 (McMillin, C.J., dissenting) (emphasis added). But here the AJ did not focus "entirely" on Jensen's "efforts" to find jobs. He also considered Jensen's actual success in doing so, his success in performing them, and his success in earning as much as or more than he had earned by playing ball, as well as his education and age. In any event, our opinion today has already noted that the majority in *Weatherspoon* wrongly construed the "usual employment" test.