995 So.2d 791 (2008)
JOHNSON ELECTRIC AUTOMOTIVE, INC., and Zurich American Insurance Company, Appellants/Cross-Appellees,
v.
Betty COLEBROOK, Appellee/Cross-Appellant.
No. 2007-WC-00448-COA.
Court of Appeals of Mississippi.
May 6, 2008.
Rehearing Denied September 16, 2008.
Certiorari Denied December 4, 2008.
*792 Joseph T. Wilkins, Tameka Wilder Buck, Jackson, attorneys for appellants.
*793 Robert H. Faulks, attorney for appellee.
Before MYERS, P.J., GRIFFIS and ROBERTS, JJ.
ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. Betty Colebrook sought workers' compensation benefits from Johnson Electric Automotive. Colebrook filed separate petitions to controvert in December 2000 and January 2001. In both petitions, Colebrook submitted that she "sustained aggravation of her [previous workers' compensation] injuries and/or new injuries" in April 2000 and July 2000. The administrative law judge found that Colebrook was not entitled to benefits because her injuries stemmed from her earlier compensable injuries. Colebrook appealed to the full Commission.
¶ 2. The full Commission disagreed with the administrative law judge. The full Commission awarded Colebrook temporary total disability benefits, permanent partial disability benefits for 78% loss-of-use of Colebrook's right arm, permanent partial disability benefits for a 50% loss-of-use of her left arm, medical expenses, penalties, and interest. Johnson Electric appealed to the Lowndes County Circuit Court. The circuit court affirmed the full Commission's decision. Aggrieved, Johnson Electric appeals, and Colebrook cross-appeals.

FACTS AND PROCEDURAL HISTORY
¶ 3. In 1973, Colebrook began working for United Technologies, the company that eventually became Johnson Electric. Different names aside, both companies manufactured various small motors. Colebrook worked in virtually every assembly-related capacity.
¶ 4. In 1997, Colebrook sustained an on-the-job injury to her right shoulder. In early 1998, Colebrook injured her neck at work. As a result, Dr. Felix Savoie performed surgery on Colebrook's right shoulder, her right wrist, and the palm of her right hand.[1] Dr. Savoie allowed Colebrook to return to limited duty in July 1999. By February 2000, Colebrook was released to work full eight-hour days.[2]
¶ 5. By way of her petition to controvert, Colebrook claimed she aggravated her previous injuries or sustained new injuries while packing motors on April 6, 2000. Colebrook also claimed she suffered another injury to her shoulder and neck on July 18, 2000. On July 19, 2000, Colebrook saw Dr. Joseph Hillman for neck and right shoulder pain, among other things. Dr. Hillman diagnosed Colebrook with cumulative left shoulder trauma and re-injury of her right shoulder. Subsequent EMG/nerve conductive studies and an MRI revealed a "mild, right sided C-5 radiculopathy, without disc bulge or herniation, and bilateral median neuropathy in both wrists." On October 4, 2000, Dr. Hillman told Colebrook that she should not return *794 to work. On December 21, 2000, and January 26, 2001, Colebrook filed petitions to controvert.
¶ 6. On March 4, 2005, the administrative law judge rendered her opinion. The administrative law judge concluded that Colebrook's injuries were a continuation of her previous injuries from which she never fully recovered. Accordingly, the administrative law judge declined to award Colebrook benefits and dismissed her claims.
¶ 7. Colebrook appealed to the full Commission. On April 5, 2006, the full Commission rendered its order. The full Commission found as follows:
Ms. Colebrook relates a credible history of having sustained an aggravating injury to her upper extremities, and possibly her neck, in April and July 2000. Although a number of physicians have weighed in on the exact nature of her condition, we are most persuaded by the findings of Dr. Hillman, her long[-]time treating physician. The medical evidence here is in conflict as to the exact nature and cause of Ms. Colebrook's current upper extremity impairments, and there are equally credibly [sic] and competent opinions on both sides of the question. In such cases, "deference must be provided to the claimant's treating physicians of choice in order to satisfy the long-recognized principles that: a) treating physicians' opinions are generally afforded more credibility and weight than those of physicians who examine the claimant solely for purposes of testifying and do not establish a physician-patient relationship; b) when there are `even questions' they are typically resolved in favor of the injured worker and c) this is done [to] satisfy the statutory mandate that doubtful cases be resolved in favor of compensation so as to satisfy the beneficient remedial purpose of the statutory law." [citations omitted]
We find, therefore, that Ms. Colebrook sustained compensable extremities [sic] on or about April 6, 2000, and on or about July 18, 2000. The Opinion of the Administrative Judge is reversed and set aside, accordingly.
....
This leads us to the question of disability, both temporary and permanent. Insofar as temporary disability is concerned, it appears Ms. Colebrook first became disabled and entitled to benefits under the Law on October 4, 2000[,] when Dr. Hillman took her off work. She remained temporarily and totally disabled until June 3, 2002[,] when she reached maximum improvement, according to Dr. Hillman. She is, therefore, entitled to temporary total disability benefits for this period of time.
Concerning permanent disability, we seek to determine the extent to which Ms. Colebrook has lost the use of her left and right upper extremities for wage earning purposes. As noted earlier, Dr. Hillman determined that Ms. Colebrook suffered a 33% functional loss-of-use of her left and right upper extremities. He also noted Ms. Colebrook was unable to continue working for the Employer, the only employment she has ever known. Dr. Hillman removed her from work completely, while Dr. Savoie limited her to lifting less than five pounds. Ms. Colebrook's physical therapist described her condition as chronic and unimproved, even after Ms. Colebrook ceased working. Ms. Colebrook made few efforts to obtain other employment, and receives [s]ocial [s]ecurity disability benefits based on these injuries, and other unrelated medical conditions.

*795 The only rebuttal offered by the Employer is the testimony of a vocational rehabilitation specialist who testified that Ms. Colebrook should have been able to continue working for the Employer as an assembler because this was a light[-]duty position that fit within her restrictions. This expert did not, apparently, identify any other suitable jobs for which Ms. Colebrook was qualified.
In trying to determine whether and to what extent Ms. Colebrook has sustained a loss-of-use of her upper extremities[,] which exceeds her functional impairment, "a variety of evidence is relevant," and "a worker making this claim must convince the Commission that employment comparable to [her] occupation prior to the time of injury was no longer attainable." [citation omitted]. "[She] might not have to prove that [s]he actually looked" for work elsewhere, but the claimant "must present relevant evidence that [she] could not perform the jobs within [her] normal occupationor occupations. That in turn can be countered by relevant evidence discrediting" the claimant's assertions. [citation omitted].
Considering all of the relevant evidence presented in this matter, it appears to us that Ms. Colebrook is significantly more limited in the use of her right arm, than in her left. While Dr. Hillman feels she cannot work at all, the testimony and records of Dr. Savoie and other medical experts leads us to conclude that Ms. Colebrook has a greater impairment to her right arm, than to the left. In fact, it seems to us, given her restrictions, her age, education, and work history, that she has suffered a total loss-of-use of her right arm for wage[-]earning purposes, and a fifty percent (50%) loss-of-use of her left arm for wage[-]earning purposes.
¶ 8. The full Commission reversed the administrative law judge and awarded Colebrook: (1) temporary total disability benefits of $303.35 per week from October 4, 2000, to June 3, 2002; (2) permanent partial disability benefits for a 78% loss-of-use of the right arm; and (3) permanent partial disability benefits for a 50% loss-of-use of the left arm at the rate of $303.35 per week.[3] The full Commission also awarded Colebrook the cost of her medical treatment, penalties, and interest.
¶ 9. Johnson Electric appealed to the Lowndes County Circuit Court. The circuit court affirmed the decision of the full Commission. Johnson Electric appeals, and Colebrook cross-appeals. Johnson Electric claims: (1) Colebrook did not suffer a new injury at work in April 2000 or July 2000; (2) the medical proof was inadequate to justify the full Commission's award; and (3) the full Commission applied undue weight to Dr. Hillman's opinion. Colebrook claims the full Commission erred: (1) when it declined to award temporary disability benefits for the additional period of time that she did not work from July 20, 2000, through August 9, 2000; (2) when it apportioned her award by 22%; and (3) when it declined to award benefits for a "whole[-]body injury."

STANDARD OF REVIEW
¶ 10. We review decisions of the Mississippi Workers' Compensation Commission pursuant to the familiar "arbitrary and capricious" standard of review. Hale v. Ruleville Health Care Ctr., 687 So.2d 1221, 1225 (Miss.1997). The full Commission *796 resolves conflicts in the evidence, and we must defer to its factual findings. Id. Instead, our review requires that we determine whether a "quantum of credible evidence" supports the full Commission's decision. Id. at 1224. We will reverse the full Commission only if its decision is based on "an error of law or an unsupported finding of fact." Meridian Prof'l Baseball Club v. Jensen, 828 So.2d 740, 743(¶8) (Miss.2002).

ANALYSIS

WHETHER THE FULL COMMISSION'S DECISION WAS BASED ON SUBSTANTIAL EVIDENCE.
¶ 11. Johnson Electric claims there was insufficient or insubstantial evidence to support the full Commission's decision. Colebrook bore the burden of proving by a preponderance of the evidence: (1) that she sustained an accidental injury; (2) which arose out of and in the course of her employment; and (3) there was a causal connection between her injury and the claimed disability. Hedge v. Leggett & Platt, Inc., 641 So.2d 9, 13 (Miss.1994) (citations omitted).
¶ 12. Johnson Electric first claims the full Commission erred when it found Colebrook suffered a compensable injury in April 2000. Johnson Electric contends Colebrook merely aggravated her initial injuries. Johnson Electric relies on three primary arguments to support its position. First, Johnson Electric notes that: (1) Colebrook was never free of pain after her initial injuries; (2) she continued to receive treatment for those injuries; and (3) she raised the same injuries in her previous petitions to controvert. Second, Johnson Electric claims there is insufficient evidence that Colebrook sustained an injury at work on April 6, 2000the injury date listed in Colebrook's petition to controvert. Johnson Electric points to the following to bolster its second argument: (1) Colebrook spent part of April 6, 2000, in Dr. Hillman's clinic; (2) Colebrook could not remember whether she returned to work that day; (3) Dr. Hillman did not note that Colebrook sustained a new injury at work; and (4) Colebrook did not report a new injury to Martha Hutcheson, Johnson Electric's human resource manager. Finally, Johnson Electric seems to claim that the full Commission applied undue weight to Dr. Hillman's opinion as opposed to that of other physicians who examined Colebrook.
¶ 13. Reviewing the deposition testimony of Dr. Hillman and Colebrook, it is clear that Colebrook was not certain when she sustained her subsequent neck injury. Colebrook testified that her neck began bothering her in April 2000, but she was not certain about the date. She testified that she injured her neck while packing small motors in a box, but she finished the workday. She also testified that, on the following day, she told Hutcheson that she needed an appointment with Dr. Hillman. According to Colebrook, she had not experienced that particular pain before. Hutcheson testified that she did not make a note of every time Colebrook came to her with complaints of pain. In any event, Colebrook testified that, according to Hutcheson, Dr. Hillman was not available at that time. Consequently, Hutcheson scheduled Colebrook for an appointment with Dr. Savoie.
¶ 14. The record contains notes from Dr. Savoie incident to an office visit with Colebrook on March 31, 2000. Dr. Savoie noted that Colebrook primarily complained of pain in her neck. Dr. Savoie also noted that he intended to "send her to Dr. Hillman to check her neck." Colebrook had an appointment at Dr. Hillman's clinic on April 6, 2000. Dr. Hillman testified that, *797 during that visit, Colebrook saw a nurse practitioner and described pain indicative of a new neck injury. Dr. Hillman elaborated and testified that Colebrook experienced "[e]ither an exacerbation of a pre-existing injury or a new injury occurred." Dr. Hillman later testified that Colebrook's neck pain from 1997 and 1998 was attributable to "the C-8 nerve root" as opposed to the neck injury that occurred approximately in April 2000, which involved "the C-5 nerve root." Dr. Hillman stated unequivocally that, in his opinion, Colebrook described a new neck injury when he saw her on April 6, 2000. It is reasonable to conclude that, although she could not remember the specific date on which she was injured, Colebrook first discovered that she had a new work-related injury during her April 6, 2000, appointment at Dr. Hillman's clinic. Based on Dr. Hillman's opinion that Colebrook suffered a new neck injury in or about April 2000, we cannot find that there was insubstantial or insufficient evidence for the full Commission's decision that Colebrook sustained a new neck injury.
¶ 15. Johnson Electric argues that the full Commission's decision was contrary to the weight of the evidence. Dr. Evan Zeiger, a neurosurgeon, concluded that Colebrook's pain was from diabetic neuropathy. Dr. Howard Katz reviewed Colebrook's medical records and found that Colebrook had diabetes, repetitive stress injury to her right arm, bilateral carpal tunnel syndrome, and no radiculopathy. Dr. Katz opined that Colebrook's problems were not related to her work. Dr. Robert Buckley, an orthopedic surgeon, opined that Colebrook's complaints were related to a long history of repetitive motion activity. However, it is for the full Commission to determine the weight and credibility of testimony. Hale, 687 So.2d at 1224-25. It is entirely possible that a reasonable person could reach a different conclusion than the full Commission reached and that such a decision would be supported by substantial evidence. Even so, we are prohibited from resolving conflicts in the evidence, and the full Commission found Dr. Hillman to be more credible in this instance.
¶ 16. Next, Johnson Electric argues that no medical evidence supports the full Commission's decision that Johnson suffered a 100% loss-of-use to her right upper extremity. Johnson Electric notes that Dr. Savoie gave a 22% impairment rating for the 1997 and 1998 injuries. According to Johnson Electric, the 100% award is based solely on Dr. Hillman's insistence that Colebrook needed cervical disc surgery. Johnson Electric submits that Colebrook does not need surgery, and her cervical and upper extremity conditions are due to diabetic neuropathy. Johnson Electric's position relies entirely on the concept that the full Commission erred when it applied greater weight to Dr. Hillman's testimony as opposed to other examining physicians. We have determined that the full Commission was within its rights to find Dr. Hillman credible. Accordingly, there is no merit to this argument.
¶ 17. As for the full Commission's decision to grant Colebrook a 50% loss-of-use award, Johnson Electric submits that there was no medical proof of a new injury or an aggravation of an old injury because any C-5 nerve involvement "has been refuted by medical specialists." Again, this argument depends on a finding that the full Commission applied undue weight to Dr. Hillman's testimony. As with Johnson Electric's other arguments that depend on this line of reasoning, this argument has no merit.
¶ 18. Finally, Johnson Electric argues that the full Commission should have applied a greater apportionment to Colebrook's *798 award. According to Johnson Electric, the settlement with United Technologies accounted for 49.7% of Colebrook's potential recovery for a total loss-of-use to her right arm. Johnson Electric then points out that the full Commission only applied a 22% apportionment. Colebrook's settlement amount with United Technologies is entirely irrelevant to her previous impairment rating. It is only a monetary figure. That is, the amount of the settlement does not determine Colebrook's impairment rating.

ISSUES ON CROSS-APPEAL

I. WHETHER THE FULL COMMISSION ERRED WHEN IT DECLINED TO AWARD TEMPORARY DISABILITY BENEFITS FOR THE TIME BETWEEN JULY 20, 2000, AND AUGUST 9, 2000.
¶ 19. Colebrook claims the full Commission erred when it declined to award her temporary disability benefits for the time between July 20, 2000, and August 9, 2000. The record shows that Colebrook did not work during that time, and Dr. Hillman took Colebrook off work in October 2000. However, the record also shows that Johnson Electric paid Colebrook short-term disability benefits during that time. Colebrook was compensated for that time. We cannot find that the full Commission erred when it declined to award temporary disability benefits for this time period.

II. WHETHER THE FULL COMMISSION ERRED WHEN IT APPORTIONED HER RIGHT EXTREMITY AWARD.
¶ 20. According to Colebrook, the full Commission erred when it apportioned her right extremity award. Mississippi Code Annotated section 71-3-7 (Rev.2000) provides in part:
Where a preexisting physical handicap, disease, or lesion is shown by medical findings to be a material contributing factor in the results following injury, the compensation which, but for this paragraph, would be payable shall be reduced by that proportion which such preexisting physical handicap, disease, or lesion contributed to the production of the results following the injury.
¶ 21. The Mississippi Supreme Court addressed apportionment of preexisting conditions in Stuart's, Inc. v. Brown, 543 So.2d 649 (Miss.1989). According to Stuart's, Inc., "[a] preexisting physical handicap, disease or lesion which did not impair wage-earning capacity ex ante by definition cannot be that which impairs wage-earning capacity ex post." Id. at 655. (internal quotations omitted). In Stuart's, Inc., the supreme court further stated:
On the other hand, in cases where (1) there is evidence of a medically cognizable, identifiable, symptomatic condition which antedated the injury; and (2) the employee experienced some absence of normal (for him or her) wage-earning capacity, then apportionment must be ordered.
Id. The supreme court clarified its ruling, citing 2 Larson, The Law of Workers Compensation, section 59.21 (1987):
Apart from special statute, apportionable "disability" does not include a prior non-disabling defect or disease that contributes to the end result. Nothing is better established in compensation law than the rule that, when industrial injury precipitates disability from a latent prior condition, such as heart disease, cancer, back weakness and the like, the entire disability is compensable, and except in states having special statutes on the aggravation of disease, no attempt is made to weigh the relative contribution *799 of the accident and the preexisting condition to the final disability or death. Apportionment does not apply in such cases, nor in any case in which the prior condition was not a disability in the compensation sense.

Stuart's, Inc., 543 So.2d at 656. Finally, Stuart's, Inc., held that "not all preexisting conditions generate a duty to apportion, only those which have produced in the claimant a preexisting occupational disability." Id.
¶ 22. Colebrook notes that, according to Dr. Savoie's August 21, 2001, report, before he released Colebrook, a nerve conduction study did not show evidence of C-5 radiculopathy or carpal tunnel syndrome, that her shoulder looked good, and she was released to return to work without restrictions. Colebrook returned to work, and she had been working overtime hours for several months before her July 18, 2000, injury. Dr. Savoie and Dr. Hillman determined that Colebrook had a new injury. Colebrook submits that her old injury was not a material contributing factor because it did not prevent her from working. Colebrook also claims her previous injury did not cause an "occupational disability" since she was working full time and had no medical work restrictions.
¶ 23. We disagree. Colebrook's prior injuries prevented her from working in her previous capacity. She was on "light duty" in April 2000 and July 2000. Further, Colebrook did not have a "latent prior condition." She had prior injuries for which she was compensated. The full Commission could have found those prior injuries were a material contributing factor to her subsequent injuries. Consequently, we find no merit to this issue.

III. WHETHER THE FULL COMMISSION ERRED WHEN IT DECLINED TO AWARD BENEFITS FOR A WHOLE-BODY INJURY.
¶ 24. Finally, Colebrook contends the full Commission erred when it did not award her benefits for a total-body injury. Colebrook never requested such benefits, and she never claimed she had a total-body injury. It follows that Colebrook cannot submit this argument for the first time on appeal. Allen v. Nat'l R.R. Passenger Corp., 934 So.2d 1006, 1015(¶23) (Miss. 2006).
¶ 25. THE JUDGMENT OF THE LOWNDES COUNTY CIRCUIT COURT IS AFFIRMED ON DIRECT AND CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS/CROSS-APPELLEES.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.
NOTES
[1] Dr. Savoie eventually assigned a 22% permanent partial impairment rating to Colebrook's right arm, but he did not place any restrictions on her employment after he discharged her.
[2] On April 16, 2004, Colebrook filed a petition for approval of a final compromise settlement incident to her 1997 and 1998 injuries. According to that document, United Technologies and its insurer previously paid Colebrook $26,966.95 in total temporary disability benefits, total permanent disability benefits, and permanent partial disability benefits. United Technologies also agreed to pay Colebrook a lump sum of $14,000 contemplated to cover expenses from September 30, 1997, through April 20, 2000. Colebrook's settlement with United Technologies had no bearing on her claims against Johnson Electric.
[3] The full Commission reduced Colebrook's award to account for Colebrook's previous 22% occupational disability.