JAMES, J.,
FOR THE COURT:
¶ 1. This appeal arises from Harold Hat-horn’s workers’ compensation claim against ESCO Corporation. After a hearing, the administrative judge found that Hathorn’s injury caused a forty-three percent permanent-partial-industrial loss. The Mississippi Workers’ Compensation Commission affirmed the order as to compens-ability due to injury but amended the or- ■ der to increase Hathorn’s industrial loss to fifty percent. Hathorn appeals the Commission’s order. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. On June 8, 2012, Hathorn suffered a compensable injury to his right hand as a result of operating his grinder at ESCO. Prior to his injury, Hathorn had worked two and one-half years as a grinder at ESCO, a company that manufactured steel parts for mining equipment. After taking medical leave to be treated, Hathorn returned to ESCO in September 2012 and continued working there until November 7, 2013.
¶ 3. Due to his injury, Hathorn was diagnosed with DeQuervain’s tenosynovitis in his right hand. Dr. James Watson, an or-thopaedic surgeon, operated on Hathorn’s hand. Dr. Watson concluded that Hathorn was at maximum medical improvement (“MMI”) on October 30, 2012, and assigned a one percent permanent medical impairment to Hathorn’s right upper extremity. Dr. Watson released Hathorn to return to work with certain restrictions: he was not to use a grinder and not to lift over fifty pounds. Hathorn continued to have pain in his right hand, and in May 2013, he began to visit Dr. Eric Pearson, a pain specialist. Dr. Pearson determined that Hathorn was at MMI on October 28,2013,[1] and assigned a twenty percent permanent medical impairment to Hathorn’s right upper extremity.
¶ 4. Upon Hathorn’s return to ESCO in September 2012, he picked up paper in the parking lot and cleaned bathrooms as an accommodation of his work restrictions. He performed various janitorial and maintenance duties and ran errands, driving an automatic company vehicle. In addition, Hathorn drove a sweeper or riding vacuum. Hathorn also painted at ESCO.
¶ 5. In late 2013, Hathorn testified that he drove a forklift for a day and “later on that evening my hand just swole [sic] up.” According to Hathorn, he called Dr. Pearson the next day, and Dr. Pearson told him not to operate a forklift again. Two weeks later, Hathorn’s supervisor asked Hathorn to drive a forklift, and Hathorn claims to have requested that another employee drive the forklift. When the incident was reported to Hathorn’s manager, ESCO placed Hathorn on leave, telling him to obtain a written work restriction that said he should not operate forklifts. Under company policy, ESCO gave Hathorn three days, November 4-6, 2013, to obtain the work restriction. Hathorn did not deliver any further restrictions to ESCO, and ESCO terminated him for insubordination on November 7, 2013.[2]
*546 ¶ 6. Hathorn filed his petition to controvert on January 10, 2014. A hearing on the merits was héld. The issue before the ad-' ministrative judge was whether Hathorn suffered an industrial loss of use of his . right arm that was greater than the medical impairment rating.
¶ 7. At the hearing, Bruce Brawner, accepted as a vocational expert, testified that Hathorn could not perform work as a grinder, but that he .could perform other work. It was Brawner’s opinion that Hat-horn was capable of performing medium-level work because of Hathorn’s functional-capacity evaluation. Brawner testified that Hathorn could perform some of the jobs he had performed in the past and that Hat-horn had demonstrated this ability when he returned to work at ESCO.
¶8. Hathorn’s prior work history was discussed in detail at the hearing. Before his employment at ESCO, Hathorn worked at Georgia Pacific as a machine operator, where he says he punched buttons. He worked at Georgia Pacific twice: from 1998 to 2001 and from 2002 to 2009. Hathorn worked at Walnut Grove Correctional Facility as a guard for one year in between his employment at Georgia Pacific. Before working at Georgia Pacific, Hathorn worked at Walmart, where he pushed carts, stocked shelves, and performed maintenance. He testified that he sometimes had to lift more than fifty pounds, but he agreed that most of his work was light-weight. Hathorn also painted at Wal-mart. Prior to Walmart, Hathorn worked as a hospital custodian and served in the United States Army.
¶ 9. The administrative judge found that Hathorn had a forty-three percent industrial loss due to his injury but that Hat-horn could perform the substantial acts of some of his former employment. ,The administrative judge also found that Hathorn was. entitled to compensation for an additional twenty-three percent , of loss as ESCO had already compensated Hathorn for his twenty percent medical loss.
¶ 10. Hathorn filed a petition for review before the Commission. The Commission affirmed the administrative judge’s factual findings but amended the administrative judge’s order to award Hathorn a fifty percent industrial loss.
¶ 11. Hathorn now appeals. On appeal he argues that the Commission’s decision was not supported by substantial evidence. Hathorn argues that because he has permanent work restrictions that prevent him from engaging in the substantial acts of his pre-injury employment, he is entitled to a presumption of a total loss'to a scheduled member.
STANDARD OF REVIEW
¶ 12. This Court’s review ' of workers’ compensation appeals is “limited to a determination of whether the decision of the Commission is supported by substantial evidence.” Casino Magic v. Nelson, 958 So.2d 224, 228 (¶ 13) (Miss. Ct. App. 2007). It is not the role of this Court to “re-weigh the evidence to determine whether the' preponderance of evidence might favor a result contrary to the Commission’s determination.” Hollingsworth v. I.C. Isaacs & Co., 725 So.2d 251, 254 (¶ 11) (Miss. Ct. App. 1998). Instead, we are obligated to affirm where the Commission’s findings are supported by substantial evidence in the record. Id.
*547 DISCUSSION
¶ 13. A claimant’s recovery in a workers’ compensation action is governed by Mississippi Code Annotated sections 71-3-1 to - 129 (Rev. 2011 & Supp. 2016). The statute defines the term “disability” as: “incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings.” Miss. Code Ann. § 71-3-3(i).
¶14. Subsection 71-3-17(a) provides that a claimant may receive compensation— “[i]n case of total disability adjudged to be permanent”—for a maximum of 450 weeks. Id. § 71-3-17(a) (“[Permanent total disability shall be determined in accordance with the facts.”). Further, subsection 71-3-17(c) governs a, claimant’s recovery for permanent partial disability to a hand. Id. § 71—3—17(c)(3) (“In case of disability partial in character but permanent in quality, the compensation ... shall be paid to the employee” for a maximum of 150 weeks for a lost hand.). The same section defines the terms “total loss of use” and “partial loss of use” as follows:
(22) Total loss of use: Compensation for permanent total loss of use of a member shall be the same as for loss of the member.
(23) Partial loss or partial loss of use: Compensation for permanent partial loss or loss of use of a member may be for proportionate loss or loss of use of the member.
Id. § 71-3-17(c)(22)-(23).
¶ 15. In addition to the statutory definitions, the courts have developed definitions that apply in workers’ compensation actions. “‘Functional’ or-‘medical’ loss refers to physical impairment.” Meridian Prof'l Baseball Club v. Jensen, 828 So.2d 740, 745 (¶ 11) (Miss. 2002). “'Industrial’ or ‘occupational’ loss is the functional or medical disability as it affects the clairti-ant’s ability to perform the duties of employment.” Id. (internal quotation omitted).
¶ 16. “[I]n some cases, despite a partial functional loss of a scheduled member, the claimant’s industrial or occupational disability or loss of wage earning capacity controls his degree of disability.” Smith v. Jackson Constr. Co., 607 So.2d 1119, 1126 (Miss. 1992). Where an employee is able to demonstrate a total occupational loss—despite a partial functional loss—section 71-3-17(a), the permanent disability subsection, governs the claimant’s amount of recovery. Smith, 607 So.2d at 1128. In fact,
Section 71-3-17(a) covers all cases of permanent total occupational disability, to the exclusion of Section 71-3-17(c) ... / Where an employee suffers an injury covered by the schedule in Section 71-3-17(c) and where that injury results in a permanent loss of wage earning capacity within Section 71-3-17(a), the latter section controls exclusively and the employee is not limited to the number of weeks of compensation prescribed in Section 71-3-17(c)’s schedule.
Smith, 607 So.2d at 1128 (emphasis in original).
¶ 17. The Mississippi Supreme Court, in Jensen, addressing this interplay between the statute’s subsections, established a rebuttable presumption: “[W]here a permanent partial disability renders a worker unable to continue in the position held at the time of injury, we hold that such inability creates a rebuttable presumption of total occupational loss of the member.” Jensen, 828 So.2d at 747 (¶ 21). “The presumption arises when the claimant establishes that he has made a reasonable effort but has been unable to find work in his usual employment, or makes other proof of his inability to perform the *548 substantial acts of his usual employment.” Id. at 747-48 (¶ 21). The Jensen court defined “usual employment” as “jobs in which the claimant has past experience, jobs requiring similar skills, or jobs for which the worker is otherwise suited by his age, education, experience, and any other relevant factual criteria.” Id. at 747 (¶ 20).
¶ 18. This rebuttable presumption is “subject to other proof of the claimant’s ability to earn the same wages which the claimant was receiving at the time of injury.” City of Laurel v. Guy, 58 So.3d 1223, 1226 (¶ 15) (Miss. Ct. App. 2011) (quoting Jensen, 828 So.2d at 747 (¶ 21)). “Rebuttal is shown by all the evidence concerning wage-earning capacity.” Id. at 1228 (¶ 24).
¶ 19. This is a case of a partial permanent disability to a scheduled member—Hathorris right hand. Hathorn argues that the Jensen presumption should apply. He claims that because of his injury he has been unable to find work and that he can no longer perform the substantial acts of his usual employment. Hathorn argues that the Commission erred by not properly applying the Jensen presumption.
¶20. We disagree. The record shows that the Commission’s findings are supported by substantial evidence. Further, the Commission correctly applied the Jensen presumption. The Commission specifically found “that the medical and vocational proof in this claim rebuts any presumption as to [Hathorris] alleged total industrial loss of use to the right upper extremity.” Substantial evidence supports this finding.
¶21. Hathorris post-injury employment at ESCO demonstrates that he can perform some of the substantial acts of his ususal employment. Hathorn worked at ESCO for more than a year after Dr. Watson determined he was at MMI. Also, Hathorn continued to work at ESCO despite his treatment with Dr. Pearson. While Hathorn no longer used a grinder or lifted over fifty pounds, he still continued his employment at ESCO for an entire year. He worked for the maintenance department, drove a company vehicle, and operated a sweeper. Plus, Hathorn performed some custodial duties similar to his work as a hospital custodian. He also painted as he had done at Walmart. In addition, Esco terminated Hathorn as a result of his failure to follow company policy, not as a result of discriminatory action by ESCO.
¶22. Brawner testified about the job opportunities that were available to Hat-horn. He recognized that Dr. Watson and Dr. Pearson released Hathorn for “medium work,” “requiring occasional lifting or carrying, pushing or pulling of up to 50 pounds and the frequent lifting or carrying, pushing, pulling of 25 pounds.” Brawn-er testified that Hathorn was “slightly above average” when considering his twelve years of education. This was significant as “some employers use that as a baseline as they seek applicants.” After “looking] at the work restrictions and determining] what jobs fit ... [that are] closely similar to what [Hathorn has] done before,” Brawner listed ten general occupations that Hathorn would be able to perform with his injury, some of which were similar to his employment at ESCO. In addition, Brawner testified that there was “a viable labor market within a reasonable commuting distance for a lot of types of jobs for which he would qualify.”
¶ 23. Hathorris suggestion that the administrative judge and Commission erred in not finding Hathorn had a total loss to his hand ignores established workers’ compensation law. Hathorn argues that he is entitled to additional compensation because he can no longer work as a grinder for the same wages that he did prior to his *549 hand injury. The Jensen court, however, found:
“[U]sual employment” is broader in scope than the job held at the time of the injury, and narrower than “other employment” as contained in § 71-3-3(i). Usual employment in this context means the jobs in which the claimant has past experience, jobs requiring similar skills, or jobs for which the worker is otherwise suited by his age, education, experience, and any other relevant factual criteria.
Jensen, 828 So.2d at 747 (¶ 20). Hathorn’s post-injury employment at ESCO was consistent with a number of the previous jobs he had worked. Also, on cross-examination, Hathorn admitted that many of his previous job duties—such as those as a machine operator for Georgia Pacific—were within the limits of his work restrictions.
¶ 24. The record also demonstrates that Hathorn did not demonstrate an incapacity post-injury to earn the same wages as he had been earning pre-injury. Hathorn’s work at ESCO evidenced this. Hathorn did not claim, that ESCO reduced his wages after he returned from the treatment of his injury. Brawner also addressed the issue of wages, recognizing that companies such as Georgia Pacific paid more today than when Hathorn had first worked for them sixteen years before.
¶ 25. Even though Hathorn’s job search was unfruitful, it is not conclusive proof that he was unemployable. Brawner’s expert testimony was that Hathorn was employable. Additionally, Hathorn admitted that he did not know the specific types of positions certain employers were offering when he filled out applications. He further testified that he did not seek employment in the security, maintenance, or housekeeping fields. Also, the administrative judge, in reaching her decision, recognized that Hathorn had not applied for a position with Weyerhaeuser Corporation[3] that “would [have] be[en] similar to the Georgia Pacific job he performed in the past.”
¶ 26. As an appellate court, our role is not to reweigh the evidence to determine if it favors a result contrary to the Commission’s decision. We are to decide if the record contains substantial evidence to support the Commission’s findings. Here, there is substantial evidence in the record to support the findings of the Commission. Therefore, we affirm.
CONCLUSION
¶27. Because there is substantial evidence in the record to support the Commission’s order, we affirm.
¶ 28. THE JUDGMENT OF THE MISSISSIPPI WORKERS’ COMPENSATION COMMISSION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, WILSON AND GREENLEE, JJ., CONCUR. FAIR, J., NOT PARTICIPATING.

. There appears to be some discrepancy as to the date that Dr. Pearson determined Hathorn to be at MMI. At the hearing, the parties stipulated to October 7, 2013, but the administrative judge stated that “Dr. Pearson was of the opinion that Claimant reached [MMI] on October 28, 2013.” Dr. Pearson’s deposition testimony, which was introduced as evidence at the hearing, appears to support October 28, 2013, as the date of Hathom’s MMI. Our analysis is the same under either date.

. A written work restriction regarding the forklift was subsequently provided to ESCO's attorney on the week of the hearing on the merits. ESCO’s representative testified that he *546 had not seen the restriction before ESCO’s attorney sent it to him, The actual restriction, dated November 7, 2013, was from Dr. Pearson. The restriction was addressed "To Whom It May Concern” and did not include any mailing address. The testimony is uncontra-dicted that ESCO was not given this restriction before the week of the hearing.

. Weyerhaeuser is located in Philadelphia, Mississippi—Hathorn’s hometown.