ROBERTS, J.,
 

 for the Court:
 

 ¶ 1. Kenneth Joe Mixon was working as a floorhand on a land-based oil rig operated by Greywolf Drilling Company when a storm blew in. Lightning struck somewhere close to or on the rig while Mixon was in the process of disassembling the rig in order to move it, and he felt electricity go through his body. Over the next several days, Mixon’s shoulders began to hurt, and he subsequently filed a petition to controvert with the Mississippi Workers’ Compensation Commission. His injuries were found to be compensable. However, Mixon now appeals and argues that the Commission erred in assessing the degree of disability as a result of his injuries, the amount of his weekly wage at the time of the incident, and other issues. Greywolf cross-appeals and argues that the Commission erred in finding that Mixon suffered a compensable injury. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. Mixon, who was fifty years old at the time, was the sole live witness to testify at the hearing before the Administrative Judge on March 14, 2008. He stated that on June 4, 2001, he was working for Grey-wolf as a floorhand on a land-based oil rig in Magee, Mississippi. Mixon’s typical schedule was twelve hours a day, seven days on/seven days off. The accident occurred on the fifth day of a seven-day stretch. Mixon stated that he had incurred some other injuries in the past, but none that involved his shoulders.
 

 ¶ 3. Mixon testified that he and other employees of Greywolf were taking apart the oil rig in order to move it. In order to be able to reach the components necessary to take the oil rig apart, Mixon had to
 
 *416
 
 stand over a drainage pit that had begun to overflow due to a rain storm that had developed. Although there was a pump designed to prevent the drainage pit from overflowing, Mixon testified that the pump had been broken since the day he started his shift. Mixon stated that he was on his hands and knees with one hand in the water holding the back side of a bolt and the other hand was unscrewing the nut. Mixon testified that “all of a sudden, it’s like I could hear the crack and I just felt it just run right though both of my hands, right though my chest. I felt the electricity.” Mixon stated that “it kind of, I want to say, drove me back or whatever.” At this point, the group stopped working and went to lunch. However, Mixon testified that during lunch his vision was hazy, and he experienced uncontrollable shaking. As a result of these symptoms, Mixon was taken to the emergency room at Magee General Hospital.
 

 ¶ 4. Mixon was seen by Dr. Kelly Smith and admitted to the hospital overnight. Dr. Smith initially told Mixon not to go back to work until a follow-up examination was done. However, Mixon testified that because Greywolf did not want a “loss-time accident,” it requested that Dr. Smith allow him to come back to work. Dr. Smith obliged Greywolf, and he allowed Mixon to return to work on a limited basis. The next day, Mixon returned to work, and Greywolf allowed him to do light-duty work, such as cleaning the living quarters, washing clothes, and washing dishes.
 

 ¶ 5. At the conclusion of his seven-day shift, Mixon returned home. However, Mixon testified that the next day his right shoulder began hurting, and he went to see Dr. Lisa Bushhardt at Immediate Care in Hattiesburg, Mississippi. Mixon saw a number of doctors over the course of several years relating to injuries he claimed he had received as a result of the incident on the oil rig. The details of these consultations and findings of the physicians will be discussed below. However, at this point, Greywolf refused to authorize further medical treatment. Greywolf also terminated Mixon’s employment on the day after the incident. Furthermore, Mix-on testified that although he remained off work per his doctor’s directive, Mixon received notice from Greywolf that his group health insurance had been cancelled.
 

 ¶ 6. Although he had not yet been released to work by his doctors, Mixon began working odd jobs in order to sustain himself. Mixon testified that he had to quit a job bagging groceries because he could not pick up certain items. In 2002, he started on a part-time basis on the
 
 Tommy Munro,
 
 the University of Southern Mississippi’s research vessel. Mixon testified that his position on the
 
 Tommy Munro
 
 was supervisory in nature. In 2004, Mixon’s secured a full-time position with the
 
 Tommy Munro.
 
 However, Mix-on testified that he would be making approximately $20,000 more a year if he was still able to do heavy manual labor.
 

 ¶ 7. During cross-examination, Mixon expounded on his work history. Mixon testified that he was in the United States Air Force from 1976 to 1980, during which time he worked as a mechanic. During approximately the next two years, Mixon worked as a bank teller for six months, a security guard for three months, a truck driver for one-and-a-half years, and on the North Slope of Alaska as an oil hand. Mixon then moved to Florida and worked for a company making circuit boards for six weeks. At this point, he began working in the landscaping and construction fields in Mississippi. But that only lasted for approximately six to eight months. Mixon then attended junior college for a semester, but because of financial considerations, he returned to commercial con
 
 *417
 
 struction. He worked in this field for approximately two years. Mixon then worked offshore in Louisiana for a period of time, then performed residential construction for approximately two years, and worked on a land-based oil rig for approximately two years. Mixon also cut grass at a golf course in Petal, Mississippi, and worked on a charter boat out of Biloxi, Mississippi. He began working for Grey-wolf on February 21, 2001.
 

 ¶ 8. Mixon testified that it was approximately 11:00 a.m. when the incident occurred. Mixon stated that he did not actually see the lightning strike the oil rig, but he heard the crack of the lightning and was “jolted up,” let go of the rig, and stepped back several steps. Mixon stated that he felt pain going through his hand, arm, and chest. He testified that he was shaking involuntarily, and after his boss asked him if he needed to go to the emergency room, he went.
 

 ¶ 9. Following the onset of his injuries, Mixon filed a petition to controvert with the Commission on August 10, 2001, claiming injuries to his heart, shoulders, body as a whole, and other injuries. The AJ found that Mixon had sustained a compensable injury and that he was entitled to disability benefits for 70% loss of use of his upper extremities. Additionally, the AJ determined that Mixon’s average weekly wage was $1,290. Greywolf appealed to the Commission. The Commission affirmed the finding of a compensable injury, but it reduced the loss of use to 25% and the average weekly wage to $607.88. Mixon appealed to the Circuit Court of Simpson County. Greywolf also filed a cross-appeal with the circuit court. However, the Commission’s order was affirmed on August 28, 2009. Mixon appealed and raises the following issues:
 

 I.WHETHER THE COMMISSION ERRED IN FINDING MIXON SUSTAINED A TWENTY-FIVE PERCENT LOSS OF USE
 

 II. WHETHER THE COMMISSION ERRED IN CALCULATING MIXON’S AVERAGE WEEKLY WAGE
 

 III. WHETHER ADDITIONAL INSURANCE CARRIERS SHOULD BE HELD ACCOUNTABLE
 

 Additionally, on cross-appeal, Greywolf argues that the Commission erred in finding a compensable injury. Finding no error, we affirm.
 

 STANDARD OF REVIEW
 

 ¶ 10. The standard of review to which an appellate court must adhere when reviewing a decision of the Workers’ Compensation Commission is clear. The Mississippi Supreme Court has held:
 

 The standard of review in workers’ compensation cases is limited. The substantial evidence test is used.
 
 See Walker Mfg. Co. v. Cantrell,
 
 577 So.2d 1248, 1245-47 (Miss.1991). The Workers’ Compensation Commission is the trier and finder of facts in a compensation claim. [An appellate court] will overturn the Workers’ Compensation Commission decision[s] only for an error of law or an unsupported finding of fact.
 
 Georgia Pac. Corp. v. Taplin,
 
 586 So.2d 823, 826 (Miss.1991). Reversal is proper only when a Commission[s] order is not based on substantial evidence, is arbitrary or capricious, or is based on an erroneous application of the law.
 
 Smith v. Jackson Constr. Co.,
 
 607 So.2d 1119, 1124 (Miss.1992).
 

 Weatherspoon v. Croft Metals, Inc.,
 
 853 So.2d 776, 778 (¶ 6) (Miss.2003). Furthermore, as is always the case, questions of law receive a de novo review.
 
 Short v. Wilson Meat House, LLC,
 
 36 So.3d 1247, 1251 (¶ 23) (Miss.2010). Finally, Mississip
 
 *418
 
 pi Workers’ Compensation Law “is construed liberally, and doubtful cases are to be resolved in favor of compensation so that the beneficent purposes of the act may be achieved.”
 
 Robinson v. Packard Elec. Div.,
 
 523 So.2d 329, 332 (Miss.1988) (citations omitted).
 

 DISCUSSION
 

 I. WHETHER THE COMMISSION ERRED IN FINDING MIXON SUSTAINED A TWENTY-FIVE PERCENT LOSS OF USE
 

 ¶ 11. Mixon argues that the Commission erred in (1) adjusting downward the amount of disability determined by the AJ and (2) basing its determination on an incorrect application of the law. Mixon argues that based primarily upon the supreme court’s holding in
 
 Meridian Prof'l Baseball Club v. Jensen,
 
 828 So.2d 740 (Miss.2002), the Commission should have awarded him 100% total occupational loss.
 

 ¶ 12. We begin our analysis of this issue by noting that an appellate court reviews the Commission’s findings and decision for error without regard to the independent findings of the AJ or circuit court.
 
 Short,
 
 36 So.3d at 1250 (¶ 16). The supreme court has held that:
 

 where a permanent partial disability renders a worker unable to continue in the position held at the time of injury, we hold that such inability creates a rebuttable presumption of total occupational loss of the member, subject to other proof of the claimant’s ability to earn the same wages which the claimant was receiving at the time of injury. The presumption arises when the claimant establishes that he has made a reasonable effort but has been unable to find work in his
 
 usual employment,
 
 or makes other proof of his inability to perform the substantial acts of his usual employment. Rebuttal is shown by all the evidence concerning wage-earning capacity, including education and training which the claimant has had, his age, continuance of pain, and any other related circumstances.
 

 Meridian Prof'l Baseball Club,
 
 828 So.2d at 747-48 (¶ 21) (emphasis added). Further, the supreme court defined “usual employment” as:
 

 broader in scope than the job held at the time of the injury, and narrower than “other employment” as contained in § 71 — 3—3(i). Usual employment in this context means the jobs in which the claimant has past experience, jobs requiring similar skills, or jobs for which the worker is otherwise suited by his age, education, experience, and any other relevant factual criteria.
 

 Id.
 
 at 747 (¶ 20). Given the supreme court’s definition of “usual employment,” it is clear that the presumption arises only when the claimant demonstrates that he has been unable, despite reasonable attempts, to find suitable employment based upon the factors above. This interpretation was applied in the supreme court’s holding in
 
 Weatherspoon.
 

 ¶ 13. In its order, the Commission cited
 
 Meridian Baseball
 
 and
 
 Weatherspoon
 
 in deciding to lower Mixon’s occupational disability rating. However, it did not mention the language cited above from
 
 Meridian Baseball
 
 regarding the presumption of 100% occupation disability rating. Nevertheless, the Commission found that, “according to [Mixon], his past experience on charter fishing boats, as well as his past experience in the Air Force and in the oil field working on motors, has contributed to his successful tenure on the
 
 Tommy Monroe
 
 [sic].” Based upon this language, we cannot agree with Mixon’s argument that the Commission failed to apply the applicable law. It is clear that the Commission
 
 *419
 
 found that Mixon had been working in a field of his usual employment, as that term was defined in
 
 Meridian Baseball.
 
 As such, the
 
 Meridian Baseball
 
 presumption did not arise. Furthermore, we held in
 
 Hill v. Mel, Inc.,
 
 989 So.2d 969, 972 (¶ 14) (Miss.Ct.App.2008), “that the ability to earn post-injury wages, even significantly diminished post-injury wages, defeats a claim of permanent total disability.” As such, we find that this issue is without merit.
 

 ¶ 14. Because the presumption did not arise, we now examine the Commission’s reduction of the amount of disability determined by the AJ, and we find no fault in the Commission’s reduction of the AJ’s determination of Mixon’s occupational disability rating. Or, as stated in terms of our standard of review, we find that the Commission’s determination of Mixon’s occupational determination is supported by substantial evidence.
 

 ¶ 15. “ ‘Disability5 means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings.” Miss.Code Ann. § 71—3—8(i) (Rev. 2000). This definition refers to an occupational disability rather than to a medical disability.
 
 Marshall Durbin, Inc. v. Hall,
 
 490 So.2d 877, 880 (Miss.1986). A worker injured in the course and scope of her employment is “entitled to compensation to the extent that [s]he has been incapacitated to earn wages.”
 
 Id.
 
 Benefits for a claimant’s permanent total disability are available under section 71-3-17(a) (Rev. 2000); benefits for permanent partial disability are governed by section 71-3-17(c) (Rev.2000).
 

 ¶ 16. Mixon was assigned a six percent medical impairment to each arm. In determining whether loss of use of a scheduled-member is total or partial for wage-earning purposes, the Commission should consider “the evidence as a whole, including the testimony of the [claimant] and the other witnesses who testified during the hearing concerning the [claimant’s] ability to use the arm for wage earning purposes after the injury.”
 
 McGowan v. Orleans Furniture, Inc.,
 
 586 So.2d 163, 167 (Miss.1991) (citation omitted). Factors that should be “considered in determining loss of wage earning capacity include the amount of education and training which the claimant has had, his inability to work, his failure to be hired elsewhere, the continuance of pain, and any other related circumstances.”
 
 McGowan,
 
 586 So.2d at 167.
 

 ¶ 17. Despite assigning a six percent medical impairment to each of Mixon’s arms, the Commission considered the factors mentioned above in determining that Mixon’s occupational loss was a greater amount. In arriving at its conclusion, the Commission considered Mixon’s long-term employment aboard the
 
 Tommy Munro,
 
 his work experience and training, his success in his employment aboard the
 
 Tommy Munro,
 
 and Mixon’s weekly wages at the time of trial. The Commission stated that while Mixon did suffer from some occupational loss, “this loss is not total as the Claimant argues because he has returned to work on a full time basis performing work for which he is qualified by training and experience, and work which still requires the use of his arms to some degree.” We agree and find that this issue is without merit.
 

 II. WHETHER THE COMMISSION ERRED IN CALCULATING MIXON’S AVERAGE WEEKLY WAGE
 

 ¶ 18. Mixon next argues that the Commission erred in its finding that his
 
 *420
 
 average weekly wage was $607.88, rather than the higher figure of $1,290 as found by the AJ. The difference in the two figures stems from the AJ’s exclusion of those weeks during which Mixon was “off’ in his seven-day-on seven-day-off-work cycle. Mixon argues that
 
 Dependents of Harris v. Suggs,
 
 283 Miss. 583, 102 So.2d 696 (1958) supports his position. However,
 
 Harris
 
 is distinguishable from the facts of this case. The supreme court in
 
 Harris
 
 determined that the claimant’s total weeks worked should be reduced by the number of days the claimant missed the opportunity to work, be it of his own choice not to show or because the conditions at his employment prohibited it.
 
 Id.
 
 at 536-37, 102 So.2d at 697-98. Additionally, Harris was hired to work five days a week and eight hours a day.
 
 Id.
 
 Therefore, the supreme court determined that for a claimant who is paid by the hour and works a typical forty-hour work week, work days that are missed by the claimant should not be included in determining his average weekly wage.
 

 ¶ 19. Mixon’s situation was different, and requires a different result. Mixon was hired to work a seven-days-on seven-days-off, twelve-hours-a-day work schedule. As noted by the Commission, such a work schedule, or something similar to it, is typical of the oil-field industry, as well as other professions. Because of Mixon’s unique schedule,
 
 Harris
 
 is inapplicable as Mixon did not miss any scheduled days, as was the basis for the supreme court’s decision in
 
 Harris.
 

 ¶20. Mississippi Code Annotated section 71-3-31 (Rev.2000), states, in pertinent part, that:
 

 When the employment prior to the injury extended over a period of less than 52 weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee earned wages shall be followed, provided that results just and fair to both parties will thereby be obtained.
 

 Direct application of the above statute worked well in the
 
 Harris
 
 case, and would work equally well when an hourly-compensated claimant works a traditional forty-hour work week. However, in Mixon’s case, the phrase “during which the employee earned wages” cannot be literally applied without some conflict of logic. As stated, Mixon was employed by Greywolf to work in a two-week work cycle. Therefore, the eighty-four hours he worked during his seven days “on” applied to that work cycle. In essence, Mixon worked in a two-week block of time. As such, we cannot say that the Commission erred in its computation of Mixon’s average weekly wage. This issue lacks merit.
 

 III. WHETHER ADDITIONAL INSURANCE CARRIERS SHOULD BE HELD ACCOUNTABLE
 

 ¶ 21. Throughout Mixon’s case, several insurance carriers have been listed on behalf of Greywolf. Greywolf s initial answer listed Summit Consulting Corporation of Louisiana. Greywolf s notice of appeal to the circuit court listed Liberty Mutual Insurance Company. Greywolfs notice of cross-appeal listed both Liberty Mutual Insurance Company and Employers Insurance Company of Wausau. And Grey-wolfs brief to this Court listed Bridgefield Casualty Insurance Company. Mixon asks this Court to note Liberty Mutual’s appearance as a joint-party carrier. Grey-wolf did not respond to this request in its brief.
 

 ¶ 22. We note that which carrier or carriers are required to satisfy the judgment of the Commission was not raised before the AJ, Commission, or circuit court. Additionally, there has not yet
 
 *421
 
 been a failure to pay the benefits found by the Commission. As such, because we generally may only speak to issues properly raised on appeal, we cannot reach any conclusion here. However, we do note that any and all insurance carriers who properly made an appearance in this case, were not properly substituted, and are contractually bound to fulfill the obligations of Greywolf with regard to Mixon’s workers’ compensation claim are liable.
 

 CROSS-APPEAL
 

 I. WHETHER THE COMMISSION ERRED IN FINDING THAT MIX-ON SUSTAINED A COMPENSA-BLE INJURY
 

 ¶ 23. On cross-appeal, Greywolf argues that the Commission erred in finding a causal connection between Mixon’s shoulder injuries and the lightning incident. Greywolf argues that the AJ’s decision as adopted by the Commission did not take into account the alleged discrepancies between Mixon’s version of events and his health-care providers’ medical opinion of causation and that the opinion of Grey-wolf s expert, Dr. Ronald Graham, was the only opinion that rose above mere speculation.
 

 ¶ 24. The first report of injury, which was completed on June 4, 2001, by Mixon and another rig-team member, stated that Mixon was working in the “celler” and performing a “nipping down” during a hard rain. It stated that Mixon was removing “BOP bolts ‘ratchet style’ by hand.” It further stated that Mixon was “holding onto a bolt [and] nut[,] heard a loud boom[, and] felt [an] electrical charge.” The report lists the equipment involved as lightning, 18-inch pipe wrench, and BOP bolts. Another report of the incident, which was also created on June 4, 2001, stated that Mixon was “backing off [a] BOP bolt, lightning struck at an estimated 75-100 yards out, [Mixon] felt electricity [and] heard boom.” It also lists the “direct cause” of the injury as “hghtning,” •with “rain and lightning, sudden storm” listed as contributing causes. The third report of injury, which was prepared on June 11, 2001, states that Mixon was in the “celler” of the oil rig and attempting to remove the “BOP” bolts while holding onto a bolt or nut. It further states that Mixon “heard a loud boom. [Mixon] says he felt an electrical charge.”
 

 ¶ 25. Dr. Smith is a board-certified family practitioner. Mixon was admitted to Magee General Hospital under the care of Dr. Smith the day after the incident. She testified by deposition that Mixon’s chief complaints upon his admittance were light-headedness, hazy vision, and tightness of the chest. Dr. Smith stated that these complaints were consistent with symptoms of a lightning strike. Furthermore, she diagnosed Mixon with a indirect-lightning-strike injury. Dr. Smith stated that per Mixon’s report to the emergency-room physician and Mixon’s account to her of what had occurred, her understanding was that Mixon “felt a shock or jolting sensation near his feet that came up toward his waist and chest,” but Mixon did not mention that he was thrown.
 

 ¶ 26. Dr. Smith testified during cross-examination that she did not believe that the indirect lightning strike that Mixon’s received was capable of tearing his rotator cuff. However, she stated that there was no way for her to be one-hundred percent sure that the lightning did not cause the injuries. Furthermore, she testified that being exposed to electricity causes the muscles in the body to clamp down. Dr. Smith stated that she thought it would be unusual for muscle to tear as a result of a lightning injury. But Dr. Smith said that she would defer to an orthopedic surgeon’s
 
 *422
 
 opinion as to whether a lightning strike could cause that type of injury.
 

 ¶ 27. Dr. William Morrison, an orthopedic surgeon, began treating Mixon on June 11, 2001, when Mixon came in complaining of pain in his right shoulder. According to Dr. Morrison’s notes, Mixon stated that he was working on a drilling rig and holding onto an instrument when he was struck by lightning. Dr. Morrison’s notes also indicated that Mixon stated he was thrown and that “witnesses said that [Mixon] was ‘as if he was shot out of a canon.’ ” An MRI of his right shoulder revealed that Mixon had a tear of the superior margin of the labrum.' Further studies of Mixon’s right shoulder in late August revealed a partial tear of the rotator cuff. Mixon also had similar complaints regarding his left shoulder. Dr. Morrison believed these injuries to be related to the lightning strike. He diagnosed Mixon with a superior labral anterior to posterior tear or SLAP tears to both shoulders.
 

 ¶ 28. Dr. Morrison saw Mixon again in September, November, and December; and Mixon was still experiencing pain and weakness in both shoulders. Because the non-surgieal treatment options had been exhausted, Dr. Morrison performed an ar-throscopy on Mixon’s left shoulder on December 19, 2001, and on his right shoulder on February 6, 2002. Mixon continued to have problems with his shoulders and receive treatment from Dr. Morrison until later in 2002, when Dr. Morrison moved his practice to Laurel, Mississippi. Dr. Morrison stated that he never medically released Mixon to return to work, but Mixon nonetheless attempted several jobs as a result of his financial situation. Dr. Morrison testified that in his opinion, Mix-on’s injuries to both his shoulders were proximately caused by an electrocution injury. During cross-examination, Dr. Morrison explained his theory of how Mixon’s injuries occurred stating:
 

 My feeling, you know, I don’t know whether the electricity had a direct or indirect effect on the shoulders. My feeling was at the time that he had this violent — you know, as the witnesses testified], it was “as if he was shot out of a cannon,” that he had some very forceful muscular contraction and positioning of his shoulders during this episode that caused it. And I don’t know — that was my feeling then and I think it is still my feeling today.... As I envisioned this, that he was thrown. He was kneeling forward when this occurred and that he was thrown back. I presume just from his description and from what he said people told him, that his arms would have been thrown backwards and that’s certainly a way that he could have injured the labrum of his shoulders by that mechanism.
 

 ¶ 29. After Dr. Morrison moved his practice, Mixon’s primary care for his shoulders shifted to Dr. Raymond Whitehead, an orthopedic surgeon. Dr. Whitehead began seeing Mixon in January 2003. Dr. Whitehead stated that the surgeries that Dr. Morrison had performed did not fully alleviate Mixon’s complaints, and Mixon was still having pain and weakness. As a result, on January 30, 2003, Dr. Whitehead performed another surgery on Mixon’s right shoulder: Dr. Whitehead opined that the surgery was needed and causally related to the injuries Mixon had sustained as a result of the lightning strike. It was also Dr. Whitehead’s opinion that the SLAP tears were consistent with having occurred as a result of the indirect-lightning strike Mixon received. Specifically, Dr. Whitehead stated:
 

 Well, it sounds as though [Mixon] had a jerking injury as a result of, you know, a lightning strike, you know. It sounds as
 
 *423
 
 though he recalled some type of — he described some type of injury where he was jerked.... I’rri picturing [Mixon] holding a metal pipe and getting knocked back.... That’s the best I can see. But if he’s holding onto something and then he gets knocked back, to me that’s a jerking motion in the arms.... You know, based on my history, he was holding onto a metal pipe[,] which was on a land-based rig would be substantial. You know, if he had both hands on a solid metal instrument that was firmly attached to a metal pipe on a land-based rig and received a subtle jerking motion involuntary force to thrust him backwards, that is very reasonable that his SLAP lesion occurred as a result of this injury.
 

 Dr. Whitehead also stated that: “I’m not a lightning expert. But if electrical current goes through the body, it depolarizes the muscles, causing [an] involuntary contraction ... of the muscles.” He further agreed that if the muscle contractions were severe enough they could partially dislocate the shoulder enough to tear the labrums.
 

 ¶ 30. Dr. Ronald Graham, an orthopedic surgeon, examined Mixon and his records at the request of Greywolf. He saw Mixon on March 20, 2002. According to Dr. Graham, Mixon stated that we was working as a roughneck on a drilling rig, standing on a two-by-twelve timber across an open dirt pit, and removing nuts and bolts when there was a lightning strike in close proximity to him. Dr. Graham stated that in his opinion Mixon’s shoulder injuries were not caused by the lightning strike. He further stated that “Mr. Mixon’s injuries, based upon his MRI scan, and on his history, are more consistent with his employment, his age, and have very little to do with a single traumatic event.” Dr. Graham stated that it was his opinion that it was more likely that Mixon’s injuries were caused by the throwing activities of moving bundles of shingles and working with a roofing company rather than having a lightning strike in his vicinity. However, Dr. Graham stated that he did not know if Mixon moved shingles in the way he suggested or how long Mixon had worked in roofing. Additionally, Dr. Graham stated that Mixon did have a previous shoulder injury in the form of a broken collar bone as a result of a motorcycle accident. However, Dr. Graham did not know when the accident was. Dr. Graham did say:
 

 Theoretically, I could arrange the application of high voltage power in such a burst that I could cause posterior dislocation of one or both shoulders. And if the angle were correct, it will be possible to detach the posterior glenoid lab-rale rim. And, therefore, technically, that would be called a SLAP lesion.
 

 However, Dr. Graham stated that Mixon’s records do not fit that scenario.
 

 ¶ 31. The AJ found that while the medical histories gathered throughout Mixon’s treatment with various medical professional varied in some respect, they were not materially inconsistent. Further, the AJ found that Dr. Morrison’s and Dr. Whitehead’s opinions of causation were more credible that Dr. Graham’s. The Commission adopted these findings. The Commission is the judge of a witness’s credibility.
 
 Short,
 
 36 So.3d at 1251 (¶23). We find that there is substantial evidence to support this conclusion.
 

 ¶ 32. Mixon testified that he was “jolted up” and “driven back” by the indirect lightning strike. Although Greywolf argues that Dr. Morrison’s and Dr. Whitehead’s opinion on causation assume facts that were not in evidence,
 
 ie.
 
 that Mixon was thrown, Mixon’s testimony corroborates his treating physicians’ opinions.
 
 *424
 
 Therefore, we find that Greywolf s cross-appeal is without merit.
 

 ¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF SIMPSON COUNTY IS AFFIRMED ON DIRECT AND CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY TO THE APPELLANT/CROSS-APPELLEE AND THE APPELLEES/CROSS-APPELLANTS.
 

 LEE AND MYERS, P.JJ., IRVING, GRIFFIS AND ISHEE, JJ„ CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. KING, C.J., AND MAXWELL, J., NOT PARTICIPATING.