# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-WC-00019-COA

**HAZEL SMITH**                                                    **APPELLANT**

**v.**

**HOWARD INDUSTRIES, INC. (SELF INSURED)**                        **APPELLEE**

DATE OF JUDGMENT:               12/15/2017
TRIBUNAL FROM WHICH             WORKERS' COMPENSATION
APPEALED:                       COMMISSION
ATTORNEY FOR APPELLANT:         H. ALEXANDER BRINKLEY
ATTORNEY FOR APPELLEE:          RICHARD LEWIS YODER JR.
NATURE OF THE CASE:             CIVIL - WORKERS' COMPENSATION
DISPOSITION:                    AFFIRMED - 12/18/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE IRVING, P.J., GREENLEE AND TINDELL, JJ.

### IRVING, P.J., FOR THE COURT:

¶1.     Hazel Smith appeals the decision of the Workers' Compensation Commission (Commission), asserting that two of its findings are unsupported by substantial evidence: (1) that Smith was capable of performing the substantial acts of her usual employment; and (2) that Smith was not permanently and totally disabled, but rather only suffered a partial, fifty percent loss of industrial use to her right upper extremity. We find that the Commission's decision is supported by substantial evidence; therefore, we affirm.

## FACTS

¶2.     At the time of the events giving rise to this appeal, Smith was employed as a final assembler at Howard Industries Inc. She was sixty years old and had worked at Howard for approximately twenty years. She reached the eleventh grade in high school and did not

obtain her GED. Prior to her employment at Howard, she worked various labor jobs, including as a shirt inspector at a factory in Arkansas; as a manager at a Pizza Hut; inspector of rice, sugar, and flour bags; and as an assistant manager at a resort. Her job as a final assembler at Howard consisted generally of pulling wire off of spools and then using a crimping gun to put leads on the wires. This job required Smith to repetitively grasp and pull the crimping gun and to lift bins containing parts that weighed more than twenty pounds. She fell into the pay grade of 11.3 and earned $12.56 per hour, which came to an average weekly wage of $807.

¶3. On August 5, 2013, while operating the crimping gun, Smith felt a sharp, shooting pain throughout her arm. She immediately reported the injury to her supervisor and sought medical care, where she learned that she had sustained an injury to her right upper extremity. She also went on to develop bilateral carpal tunnel syndrome. Following her injury, Smith returned to Howard and continued to work in a different capacity—driving a forklift—until she had the first of several surgeries by Dr. Rocco Barbieri on December 18, 2013.[1] On November 10, 2014, Dr. Barbieri diagnosed Smith with a four percent upper-extremity impairment, determined that she had reached maximum medical improvement (MMI), and summarized the findings of a functional capacity exam, which he approved and adopted in determining the work limitations to be placed on Smith:

---

[1] Dr. Barbieri performed one surgery to treat her carpal tunnel syndrome and two surgeries to treat her thumb injury.

A Functional Capacity Exam was performed by Drayer Physical Therapy and it demonstrated findings that the patient was recommended for a light duty level of work which [is] really no lifting more than 20 pounds and some specifics on avoiding paths that would require balance on uneven surfaces due to preexisting problem with polio. She also should avoid a combination of repetitive forceful grasping and vibration, as well as sustained posturing of the wrists greater than 30 degrees of flexion as this may worsen her carpal tunnel.

My opinion, at this time, is that this Functional Capacity Evaluation is in line with what I perceived the patient being able to do regarding her work activities and I will release her to work with these restrictions of light duty limitations. Essentially, she will not be allowed to lift or carry more than 20 pounds, will avoid unusual postures of the wrist or sustained repetitive gripping actions.

Smith returned to Howard in September 2016. Her job title and pay grade stayed the same as prior to her injury, but her pay was raised to $12.96 per hour due to a company-wide increase. She was offered a new job that allegedly fell within her medical restrictions. This job consisted of pulling rubber tips off of threads. Smith testified that she attempted the job but was unable to pull the rubber tips off due to the immobility of her thumb. She was accompanied by John Risher, Howard's environmental and safety manager. When Smith informed Risher that she was unable to properly grip the rubber tips due to her thumb, he moved her to another job. She burned her arm and was subsequently sent home and told that someone from Howard would call her; however, she has not heard from Howard since that date. Smith contends that she searched for work elsewhere but was unsuccessful.

¶4.     Smith timely filed a petition to controvert on February 19, 2015. On February 1, 2017, an administrative judge (AJ) conducted a hearing to determine the existence and extent of permanent disability and any applicable penalties and interest. The parties stipulated that

3

Smith's August 5, 2013 injury was work-related, that she began accruing disability on December 18, 2013, and that she reached MMI on November 10, 2014. The parties also stipulated that Smith's average weekly wage was $807.

¶5.     During the hearing, Smith testified regarding the requirements of her job. Pete Mills, a vocational rehabilitation counselor, testified that he went to Howard and observed several different positions. He developed a list of three different jobs that he believed fell within Dr. Barbieri's medical restrictions for Smith and issued a report including that information. Mills also conducted a job survey, wherein he analyzed Smith's past work history and education level and determined what types of jobs might be available to her. On January 12, 2017, ten days before the hearing, he composed a list of four openings for which Smith might be suited: openings at Red Lobster, Krystal, IHOP, and TGI Fridays. The pay for each of these positions was $7.25 per hour. Mills testified that on the day before the hearing, he went online and found that the TGI Fridays and IHOP positions had been filled. Despite this, Mills opined that he felt that Smith was able to find employment with a company other than Howard. Mills further opined that Smith had not been effectively conducting her job search; specifically, Mills testified that Smith had been writing "light duty" on each of her applications—which deterred potential employers—and there was inconsistency in the rate at which she was submitting applications.

¶6.     Risher testified that Smith was unable to return to her pre-injury position as a final assembler due to the medical restrictions imposed by Dr. Barbieri. He stated that the job that

4

Smith was offered when she briefly returned in September 2016—removing rubber tips—fell within those restrictions. On cross-examination, Risher conceded that the duties required by the job removing rubber tips might require repetitive gripping actions, which fell outside of Dr. Barbieri's restrictions for Smith; however, Risher maintained that the job could be done with either hand. Risher further testified that the other two jobs on Mills's list were not offered to Smith because she told him she could not do the work.

¶7.    Following the hearing, the AJ issued an order finding that Smith had sustained a 50% industrial loss of use to her right upper extremity and that she consequently could not perform the substantial acts of her usual employment. The AJ ordered Howard to pay Smith permanent disability benefits of $449.12 beginning November 11, 2014, for a period of 100 weeks as compensation, with 10% interest added to each installment as provided by Mississippi Code Annotated section 71-3-37(5) (Rev. 2011).

¶8.    Smith appealed the AJ's findings, arguing that she erred in finding that Smith only suffered a 50% loss of industrial use to her right upper extremity and in performing a loss of wage-earning-capacity analysis to decide the industrial loss of use of a scheduled member, which is inconsistent with existing workers' compensation law. The Commission adopted the AJ's findings in relevant part and affirmed its finding that Smith suffered a 50% loss of industrial use to her right upper extremity; however, it amended the AJ's order to find that although Smith had suffered a loss of industrial use in excess of her medical impairment rating, she was capable of performing the substantial acts of her usual employment. Smith

filed this timely appeal.

## DISCUSSION

¶9.     Smith asserts two issues on appeal; however, because our analysis necessarily invokes both issues, we discuss them together.    The standard of review regarding workers' compensation matters is well-settled in Mississippi caselaw:

> In workers' compensation cases, this Court's review is limited to determining whether the Commission's decision was supported by substantial evidence, was arbitrary and capricious, was beyond the scope or power of the agency to make, or violated constitutional or statutory rights.  The Commission is the ultimate fact-finder and judge of the credibility of witnesses; therefore, we may not reweigh the evidence that was before the Commission.  When the Commission's decision is supported by substantial evidence, it must be upheld. This remains true even though we might have reached a different conclusion were we the trier of fact.    Furthermore, we are reminded that workers' compensation law is to be liberally and broadly construed, resolving doubtful cases in favor of compensation so that the beneficent purposes of the act may be accomplished.

*Howard Indus. Inc. v. Hardaway*, 191 So. 3d 1257, 1261-62 (¶10) (Miss. Ct. App. 2015) (citations and internal quotation marks omitted).

¶10.    As the Commission notes in its order, this is a scheduled-member case.  "Mississippi Code Annotated section 71-3-17 (Supp. 2014) provides two avenues for a claimant seeking compensation for loss of a scheduled member.  Subsection (a) applies to claims for permanent total disability, whereas subsection (c) applies when . . . the claimant seeks permanent partial disability benefits."   *Hardaway*, 191 So. 3d at 1265-66 (¶24). Determination of whether a claimant has suffered permanent total disability or permanent partial disability controls which analysis we conduct in order to calculate benefits.

6

¶11. Here, Smith contends that she suffered permanent total disability and argues that both the AJ and the Commission erred in finding that she only sustained a 50% industrial loss of use of her right upper extremity. Smith maintains that despite her 4% medical impairment rating, she suffered a 100% industrial loss of use of her right upper extremity such that she has been rendered permanently and totally disabled. In support of her argument, Smith points to both her testimony and Risher's testimony that she was unable to return to the job she held pre-injury. Smith also argues that Howard presented no vocational testimony to show that Smith was employable post-injury. Howard, in contrast, argues that the evidence presented shows that Smith was not totally disabled: Mills, the vocational expert, located three jobs inside Howard and four jobs outside Howard that purportedly fell within Smith's medical restrictions. Howard maintains that Smith offered no evidence to suggest that she was unable to perform these jobs, aside from her own self-serving testimony that she was simply incapable of doing them.

¶12. This Court in *Howard Industries Inc. v. Satcher*, 183 So. 3d 907, 912 (¶14) (Miss. Ct. App. 2016), set forth the requirements for establishing a prima facie case of permanent total disability where, as here, the claimant has only suffered a partial medical loss:

> To establish a prima facie case for permanent total disability, the claimant has the burden to show he has sought and been unable to find work in the same or other employment. The claimant must show he took reasonable efforts to find other employment. The claimant can also establish a prima facie case for total disability if, after reaching MMI, the claimant reports back to the employer for work and the employer refuses to reinstate or rehire him. After the claimant makes out a prima facie case, the burden shifts to the employer to rebut or refute the claimant's evidence by showing the claimant's efforts were not

7

reasonable or were a sham. The issue of whether a claimant's permanent disability is partial or total is a question of fact determined by the evidence as a whole, including both lay and medical testimony.

(Citations and internal quotation marks omitted). "To determine the reasonableness of the claimant's job search, factors are examined such as job availability, economics of the community, the claimant's skills and background, and the nature of the disability." *Id*. at 913 (¶17). "Another consideration in determining disability is wage-earning capacity. Factors examined for loss of wage-earning capacity include the amount of education and training that the claimant has had, inability to work, failure to be hired elsewhere, and the continuance of pain." *Id*. "In order to be deemed permanently totally disabled under Mississippi Code Annotated section 71-3-17(a) (Rev. 2000), a claimant must show something more than an inability to return to the job existing at the time of injury." *Flowers v. Crown Cork & Seal USA Inc.*, 168 So. 3d 1009, 1018 (¶27) (Miss. Ct. App. 2013).

¶13. Based on the above caselaw, it is this Court's opinion that the Commission and AJ correctly concluded that Smith was not permanently and totally disabled. Although Smith testified at trial that she was unable to perform the jobs offered to her upon her return to Howard in September 2016, this testimony, combined with her contention that she is unemployable, is not sufficient to overcome the high burden of showing that the Commission's decision was unsupported by substantial evidence.

¶14. We note, as the Commission also properly noted, that a rebuttable presumption of total occupational loss arises where a permanent partial disability renders the claimant unable to

continue in the position she held at the time she sustained her work-related injury, "subject to other proof of the claimant's ability to earn the same wages which the claimant was receiving at the time of injury." *Meridian Prof'l Baseball Club v. Jensen*, 828 So. 2d 740, 747 (¶21) (Miss. 2002). This presumption arises "when the claimant establishes that he has made a reasonable effort but has been unable to find work in his usual employment, or makes other proof of his inability to perform the substantial acts of his usual employment." *Id*. at 747-48 (¶21). The employer may rebut this presumption by pointing to "all the evidence concerning wage-earning capacity, including education and training which the claimant has had, his age, continuance of pain, and any other related circumstances." *Id*. at 748 (¶21).[2]

¶15. Here, Smith contends that the Commission's decision that she was able to perform the substantial acts of her usual employment is unsupported by substantial evidence. However, we disagree. Smith relies on the fact that Risher, Howard's representative, conceded that she could not return to the job she held pre-injury as proof that she was unable to perform the substantial acts of her usual employment. However, Mississippi caselaw is clear that "'usual employment' is broader in scope than the job [that the claimant] held at the time of injury." *Id.* at 747 (¶20). "Usual employment in this context means the jobs in which the claimant

_____

[2] Of note is the fact that "there is a difference between the job-search requirement for a claim for permanent total disability benefits under subsection (a) and the job-search requirement for a claim for permanent partial disability benefits under subsection (c). A claim made under subsection (a) is subject to the most rigorous test for disability, which requires convincing medical proof of total disability and a legitimate job search for suitable employment." *Hardaway*, 191 So. 3d at 1266 (¶25) (internal quotation marks omitted).

9

has past experience, jobs requiring similar skills, or jobs for which the worker is otherwise suited by his age, education, experience, and any other relevant factual criteria." *Id.*

¶16. We note that Smith failed to provide any evidence or testimony that she was, in fact, unable to perform the job presented to her in September 2016 when she returned to Howard for a few hours. All we have to rely upon is her own testimony that she was unable to perform the job. In contrast, we have testimony from both Risher and Mills that the job offered to Smith—removing rubber tips—fell within her medical restrictions. Smith provided insufficient evidence to overcome the high burden of showing that the Commission's decision was unsupported by substantial evidence with respect to this issue. As such, we affirm the Commission's finding that she was capable of performing the substantial acts of her employment.

¶17. Section 71-3-17(c) (Rev. 2011) provides the following:

> In case of disability partial in character but permanent in quality, the compensation shall be sixty-six and two-thirds percent (66-2/3%) of the average weekly wages of the injured employee, subject to the maximum limitations as to weekly benefits as set up in this chapter, which shall be paid following compensation for temporary total disability paid in accordance with paragraph (b) of this section, and shall be paid to the employee as follows:

> | Member Lost | Number Weeks Compensation |
> |---|---|
> | (1) Arm | 200 |

> . . . .

¶18. As previously stated, the AJ ordered Howard to pay Smith $449.12 per week for a period of 100 weeks. She included the following analysis in her order:

10

[Smith] applied for the four positions [that] were identified in the vocational report - Red Lobster; Krystal; IHOP; and TGI Fridays. All of those positions offered $7.25 per hour. At the time of her injury, Smith was making $12.56 per hour with the Employer. If Smith had actually been hired by one of those employers, she would have suffered a $5.31 per hour loss of wages, which calculates to a $212.40 loss per week or an approximate 42% loss of wages. If overtime were considered, Smith would lose about half of her weekly income by taking one of the four positions identified by the vocational expert.

We find substantial evidence supporting the Commission's finding that Smith was not totally and permanently disabled and that she suffered only a 50% industrial loss of a scheduled member. Therefore, it follows that Smith was not entitled to 450 weeks of compensation for permanent-total disability or 200 weeks of compensation for loss of a scheduled member. The order of the Commission awarding Smith $449.12 for one hundred weeks is **AFFIRMED.**

**LEE, C.J., GRIFFIS, P.J., BARNES, CARLTON, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**