# THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-WC-01193-COA

| | |
|---|---|
| **WASHINGTON COUNTY BOARD OF SUPERVISORS AND MS PUBLIC ENTITY WC TRUST** | **APPELLANTS** |
| **v.** | |
| **JOHN SMITH** | **APPELLEE** |

| | |
|---|---|
| DATE OF JUDGMENT: | 06/24/2019 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEY FOR APPELLANTS: | R. BRITTAIN VIRDEN |
| ATTORNEY FOR APPELLEE: | YANCY B. BURNS |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REMANDED IN PART - 09/15/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### EN BANC.

### BARNES, C.J., FOR THE COURT:

¶1. The Washington County Board of Supervisors and the Mississippi Public Entity Workers' Compensation Trust (Employer/Carrier) appeal from the Mississippi Workers' Compensation Commission's (Commission) order finding that John Smith suffered a 100% loss of industrial use in his right lower extremity and sustained a compensable mental injury. The Commission awarded Smith permanent partial disability benefits and ordered the Employer/Carrier to pay for and provide any medical treatment that is reasonable, necessary, and related to Smith's compensable mental injury. The Commission also affirmed a separate

order of the Administrative Judge (AJ) compelling the Employer/Carrier to provide evaluations to determine whether the placement of a spinal cord stimulator was reasonable, necessary, and related to Smith's injury.

¶2. On appeal, the Employer/Carrier claims (1) the Commission's finding that Smith sustained a 100% loss of industrial use to his right lower extremity was not supported by substantial evidence; (2) the Commission's finding that Smith had a compensable mental injury was not supported by substantial evidence; (3) the Commission erred by affirming the AJ's separate order compelling it to pay for and provide evaluations to determine whether the placement of a spinal cord stimulator was reasonable, necessary, and related to Smith's injury; and (4) the Commission erred by failing to address whether the Employer/Carrier was entitled to apportionment or set-off credit for payments related to medical treatments for Smith's back.[1]

¶3. After review, we find that substantial evidence supported the Commission's finding that Smith sustained a 100% loss of industrial use of his right lower extremity and that the Commission did not err in affirming the AJ's separate order compelling the

---

[1] In its brief, the Employer/Carrier raises an additional issue: whether the Commission's finding that Smith's back condition was caused by his right knee injury was supported by substantial evidence. However, the Employer/Carrier does not assert this as a separate issue in the Argument section of its brief. Therefore, we will only address this issue to the extent that it is necessary to resolve the issues properly raised on appeal. *See* M.R.A.P. 28(a)(7) ("The argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on.").

Employer/Carrier to provide evaluations to determine whether the placement of a spinal cord stimulator was reasonable, necessary, and related to Smith's injury. Therefore, we affirm in part. We find, however, that no substantial evidence supported the Commission's finding that Smith sustained a compensable mental injury; accordingly, we reverse and render in part. Finally, because neither the AJ nor the Commission ruled on the issue of apportionment or set off, we remand for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶4. On March 29, 2016, John Smith, a correctional officer employed by the Washington County Board of Supervisors, was injured while trying to detain an inmate. Smith was initially diagnosed with a right-knee strain. However, in April 2016, an MRI showed a complete tear of his patellar tendon. After undergoing surgery to repair the tendon, Smith continued to have lower extremity pain as well as back pain. In April 2017, Smith filed a petition to controvert, claiming that he had sustained work-related injuries to his patellar tendon, lower extremity, and back. The Employer/Carrier admitted that Smith had sustained an injury but denied that he had injured parts of the body as stated in the petition to controvert.[2] Almost a year later, in March 2018, Smith filed an amended petition to controvert, claiming that he had suffered a compensable mental injury. The Employer/Carrier disputed this claim as well.

---

[2] At the hearing before the AJ, the Employer/Carrier stipulated that Smith suffered a work-related injury to his right leg.

3

##### I. Medical History (Physical Injury)

###### A. *Dr. Craft*

¶5. A few months after Smith's patellar-tendon surgery, in July 2016, Dr. Jason Craft, with the Mississippi Sports Medicine & Orthopedic Center, stated that Smith could return to sedentary work. Smith continued to complain of pain; so Dr. Craft again took him off work in September 2016 and referred him to Dr. Michael Winkelmann with NewSouth NeuroSpine. Smith also began seeing Dr. Timothy Beacham and Mandy Windham, a nurse practitioner, with Comprehensive Pain Specialists.

¶6. In January 2017, Dr. Craft noted that Smith had continued knee pain and intervertebral disk displacement. According to Dr. Craft, "[It] sounds like [Dr. Winkelmann and Dr. Beacham] were thinking complex regional pain syndrome [(CRPS), formerly known as RSD]." Dr. Craft stated, "I do think this is a component of [CRPS], and I do think a trial of . . . injections would be in order . . . ." In June 2018, Dr. Craft stated that Smith had reached maximum medical improvement and should continue pain management.

###### B. *Dr. Winkelmann*

¶7. In November 2016, Dr. Winkelmann noted that Smith's tendon appeared to have a small recurrent tear and that Smith had continued pain in his lower extremity as well as back pain. According to Dr. Winkelmann, Dr. Craft was primarily concerned about Smith's lower-extremity pain and thought there may be a CRPS component. Ultimately, Dr. Winkelmann ordered an MRI of the spine and physical therapy.

4

¶8. In March 2017, Dr. Winkelmann was asked if he had an opinion as to whether Smith's back pain was causally related to the injury or work incident. He was also asked whether his treatment recommendations were directed at treating the work-related conditions. Dr. Winkelmann responded, "I do feel that the injury was related to [the] work-related incident when he had to retain the inmate . . . [, and] yes, I believe my treatment recommendations are appropriate and necessary for the well-being of the patient."

¶9. On August 1, 2017, Dr. Winkelmann noted that Smith continued to have a significant amount of "right lower extremity pain from his [CRPS]." However, he noted that Smith did not wish to have a spinal cord stimulator placed in an attempt to alleviate the pain. Dr. Winkelmann opined that Smith had reached maximum medical improvement and that he had a 5% partial permanent impairment rating to the lower extremity and a 2% sensory impairment rating to the lower extremity, for a 7% impairment rating to the lower extremity.

¶10. On August 16, 2017, Smith had a Functional Capacity Evaluation (FCE). The examiner noted that Smith had deficits in his right lower extremity. However, Smith performed most tasks at a heavy level, except the waist-to-floor lift was performed at a medium level. The examiner noted the following limitations as potential barriers for Smith returning to work: walking, forward bending, kneeling, and crouching. According to the examiner, Smith's walking and standing had "some limitation," his forward bending and kneeling had "significant limitation," and his crouching was "self-limited." The examiner noted that he was unable to fully assess Smith's ability to return to work because a job

description was not available.

¶11. Approximately one week later, on August 22, 2017, Dr. Winkelmann noted that Smith was considering the placement of a temporary spinal cord stimulator. He also noted that per the FCE, Smith could perform work at a medium-to-heavy level, and he indicated that Smith could return to work under those restrictions. Dr. Winkelmann also imposed a restriction of lifting no more than thirty pounds frequently.

¶12. During his deposition in February 2018, Dr. Winkelmann opined that Smith injured his back during the work incident. He explained that an MRI showed "a little disk bulge and maybe a little mild neural . . . narrowing." It was suggested to Dr. Winkelmann that Smith did not complain of back pain until months after the work incident. Dr. Winkelmann stated that suggestion did not necessarily alter his opinion. According to Dr. Winkelmann, a person would typically experience pain within a few day, but it was possible that Smith was preoccupied with the pain in his lower extremity.

¶13. In addition, Dr. Winkelmann stated that Smith's CRPS symptoms were confined to his lower extremity and did not have anything to do with his back. According to Dr. Winkelmann, the placement of a spinal cord stimulator would be for his CRPS and lower-extremity pain. However, Dr. Winkelmann stated that because the pain had subsided, he would not make any further recommendation for a stimulator unless CRPS became a major problem.

¶14. Several months after the deposition, in September 2018, Smith again saw Dr.

Winkelmann, who noted that Smith "ha[d] been developing what appeared to be [CRPS] and for that reason, he had the persistent problem with right lower extremity, pain particularly." He stated, "[Smith] may be a candidate for a stimulator placement and for that reason, we will make the referral to Dr. Laseter for evaluation as well as Dr. Jeanne Koestler for evaluation."

### C.     Dr. Beacham and Nurse Windham

¶15.    In March 2017, Nurse Windham diagnosed Smith with knee pain, CRPS, and lumbago. The medical record was co-signed by Dr. Beacham. In a separate document, Dr. Beacham stated that he expected Smith to reach maximum medical improvement (MMI) in six to twelve months. He indicated that Smith had the following restrictions: no standing for prolonged periods, no walking for long distances, and no lifting greater than thirty pounds.

¶16.    In a letter dated March 21, 2018, Dr. Beacham was asked, "Are the chronic lumbar and thoracic symptoms for which you provided treatment causally related to the reported injury mechanism?" In a handwritten response, Dr. Beacham stated, "No." Dr. Beacham was also asked, "What limitations or restrictions if any are causally related to these impairments?" He responded, "FCE reported limitations as to moderate to heavy activity."

### D.     Dr. Collipp

¶17.    In April 2017, Dr. David Collipp, with NewSouth NeuroSpine, performed an Independent Medical Examination (IME) for the Public Employees' Retirement System of

Mississippi (PERS). Dr. Collipp noted that Smith had his tendon repaired and that he had been diagnosed with CRPS and a spine injury. According to Dr. Collipp, Smith's examination was complicated. However, Dr. Collipp did not believe any restrictions were necessary for Smith's knee. Dr. Collipp limited Smith to "about medium activity with a max lift of only 60 [pounds]." However, Dr. Collipp indicated that this limitation was due to Smith's morbid obesity. Finally, Dr. Collipp opined that there was no present evidence of CRPS or a spine injury.

### E. Dr. Katz

¶18. In December 2017, Dr. Howard Katz with Gulf States Physical Medicine and Rehabilitation performed an IME. According to Dr. Katz, Smith's obesity and a cyst may have delayed his healing and caused ongoing knee pain. Dr. Katz stated that Smith "does not have the abnormalities required to diagnose [CRPS]," and he did not recommend a spinal cord stimulator. According to Dr. Katz, Smith had reached maximum medical improvement in June 2017. And he assessed Smith as having an 8% impairment rating to the right lower extremity; however, he did not strongly disagree with Dr. Winkelmann's 7% impairment rating. According to Dr. Katz, Smith performed "very heavy duty work" prior to his injury and was capable of "medium level work" at the time. Dr. Katz stated that Smith could kneel rarely, occasionally stand/walk, and exert approximately forty pounds of force occasionally or twenty-five pounds frequently.

### F. Dr. Blount

¶19. In March 2018, Dr. Philip Blount, with Methodist Pain and Spine Center, noted that Smith had suffered a knee injury. Dr. Blount opined that the medical record review and examination did not meet the criteria for CRPS. Dr. Blount did not recommend the placement of a spinal cord stimulator. Dr. Blount stated, "It is possible that due to gait disturbance, Mr. Smith is having mechanical low back pain." Dr. Blount agreed with the MMI date, impairment rating, and medium-to-heavy work restrictions assigned by Dr. Winkelmann.

## II. Medical History (Mental Injury)

¶20. In October 2017, Smith began counseling sessions at Life Help. Smith reported that he had sustained a work-related injury and that he had experienced sleep issues, depression, anxiety, and had thoughts about hurting himself and others. However, he also indicated that he had experienced anxiety a couple of times a week for several years prior to the incident. Throughout the therapy sessions, he indicated that he was angry about the work incident. During one therapy session, Smith threatened the Sheriff, which resulted in the therapist's reporting Smith's statements to her supervisor and the Sheriff's Department. Smith often brought his girlfriend to therapy and reported issues with her, family conflicts, and other interpersonal problems. Ultimately, Smith was diagnosed with major depressive disorder ("moderate, single episode, with anxious distress") and post-traumatic stress disorder.

## III. Employment

¶21. In a letter dated November 21, 2017, Smith's employment was terminated. Smith's

employer indicated that he had been notified that Smith had been released to work. Because the employer had not heard from Smith, he considered the position abandoned.

¶22.   Smith's former supervisor, Lieutenant Darren Addison, completed an "Employer's Certification of Job Requirements" for PERS. Lieutenant Addison indicated that Smith had been offered light-duty work without a deduction in pay. Major Andrew Kaho agreed but did not know when the offer was made to Smith; he admitted that no permanent light-duty position was available.[3]  According to Smith, the light-duty position was offered while he was still under total work restrictions. But after his FCE, Smith went to the Administrator's office, informed them of his restrictions, and asked for his job back. Smith also stated that he tried to re-apply for his job after he was terminated but was told that he would have to go in front of a board.

¶23.   Lieutenant Addison also completed an "Employer's Job Activities Checklist" for PERS. According to Lieutenant Addison, correctional officers were frequently required to walk and lift less than ten pounds. They were occasionally required to sit, stand, bend at the waist, and lift less than thirty-five pounds. They were rarely required to squat, kneel, crawl, climb a ladder, and lift thirty-five to 100 pounds. During his deposition, Major Kaho stated that he agreed with Lieutenant Addison, and he thought that the job was medium level. However, he admitted that the job required physical force. According to Smith, correctional

---

[3] According to Major Kaho, Smith would have been assigned to the outer gate of the facility "until he was able to work inside."

officers were primarily required to patrol the facility, oversee inmates, and protect themselves and others. According to Smith, 80% of the job involved walking or standing, and 20% involved sitting. Smith stated, "[Y]ou've got to sneak a sit. . . . [I]n a correction facility, you don't have a break." According to Smith, he was not capable of returning to his employment because he could not defend himself against a 200 or 300 pound inmate, but he said he would return if his restrictions were accommodated.

¶24. In 2018, Smith began working with Kathy Smith, a vocational rehabilitation counsel, in an attempt to find another job. According to Kathy, Smith reported that he had applied for approximately 200 jobs including his former job. Kathy stated that Smith was a cooperative client and did everything she asked him to do. According to Smith, the positions that he applied for were filled, the positions did not exist, or his restrictions could not be accommodated.

## IV. The Administrative Judge's Ruling

¶25. After a hearing, the AJ entered his order on November 7, 2018. The AJ found that Smith had sustained a 100% loss of industrial use of his right lower extremity. Accordingly, the AJ ordered the Employer/Carrier to pay Smith permanent partial disability benefits in the amount of $279.06 per week beginning August 1, 2017, and continuing for 175 weeks. The AJ also ordered the Employer/Carrier to pay for "medical services and supplies as are reasonable and necessary as required by the nature of [Smith's] injury and the process of recovery therefrom. . . ." However, the AJ found that Smith did not prove his mental-injury

11

claim. Subsequently, the Employer/Carrier filed a petition for review with the Commission, and Smith filed a cross-petition.

## V. The Commission's Ruling

¶26. The Commission entered its order on June 24, 2019. The Commission affirmed the AJ's ruling that Smith had sustained a 100% loss of industrial use of his right lower extremity. However, the Commission reversed the AJ's ruling as to Smith's mental-injury claim. The Commission found that Smith had established a compensable mental injury, though the injury did not result in any temporary or permanent disability.

¶27. Ultimately, the Commission ordered the Employer/Carrier to pay permanent partial disability benefits to Smith. The Commission also ordered the Employer/Carrier to pay for and provide any medical treatment that is reasonable, necessary, and related to Smith's compensable mental injury. Finally, the Commission affirmed the AJ's special order compelling the Employer/Carrier to provide evaluations to determine whether the placement of a spinal cord stimulator was reasonable, necessary, and related to Smith's work injury.

## STANDARD OF REVIEW

¶28. In workers' compensation cases, "[i]f the Commission's order is supported by substantial evidence, this Court is bound by the Commission's determination, even if the evidence would convince us otherwise if we were the fact-finder." *Prairie Farms Dairy v. Graham*, 270 So. 3d 37, 41 (¶10) (Miss. Ct. App. 2018) (quoting *Forrest Gen. Hosp. v. Humphrey*, 136 So. 3d 468, 471 (¶14) (Miss. Ct. App. 2014)). "Because the Commission

serves as the ultimate fact-finder and judge of the credibility of witnesses, we may not reweigh the evidence that was before the Commission." *Id*. (quoting *Pruitt v. Howard Indus*. *Inc.*, 232 So. 3d 822, 825 (¶7) (Miss. Ct. App. 2017)).

## DISCUSSION

I. **Whether substantial evidence supports the Commission's finding that Smith sustained a 100% loss of industrial use to his right lower extremity.**

¶29. The Employer/Carrier claims that the Commission's finding that Smith sustained a 100% loss of industrial use to his right lower extremity was not supported by substantial evidence.

¶30. In workers' compensation cases, "the law compensates for two types of loss of use: (1) 'functional' or 'medical' and (2) 'industrial' or 'occupational.'" *Mueller Industries Inc. v. Waits*, 283 So. 3d 1137, 1142 (¶16) (Miss. Ct. App. 2019) (quoting *City of Laurel v. Guy*, 58 So. 3d 1223, 1226 (¶13) (Miss. Ct. App. 2011)). Our supreme court has stated that "industrial or occupational loss is the functional or medical disability as it affects the claimant's ability to perform the duties of employment." *Id*. (quoting *Meridian Pro. Baseball Club v. Jensen*, 828 So. 2d 740, 745 (¶11) (Miss. 2002)). "In cases like the one before us, where a claimant's industrial/occupational loss is greater than the medical/functional loss, 'the claimant's industrial or occupational disability or loss of wage-earning capacity controls his degree of disability.'" *Id*. (quoting *Smith v. Jackson Constr. Co.*, 607 So. 2d 1119, 1126 (Miss. 1992)).

13

¶31. This Court has held that "where a permanent partial disability renders a worker unable to continue in the position held at the time of injury, . . . such inability creates a rebuttable presumption of total occupational loss of the member, subject to other proof of the claimant's ability to earn the same wages which the claimant was receiving at the time of injury." *Id*. at (¶17) (quoting *City of Laurel v. Guy*, 58 So. 3d 1223, 1226 (¶15) (Miss. Ct. App. 2011)). "A presumption of total occupational loss arises 'when the claimant establishes that he has made a reasonable effort but has been unable to find work in his usual employment, or makes other proof of his inability to perform the substantial acts of his usual employment." *Id*. at 1142-43 (¶17) (quoting *Guy*, 58 So. 3d at 1126-27 (¶15)). "An employer can then rebut this presumption by showing 'all the evidence concerning wage-earning capacity . . . ." *Id*. at 1143 (¶17).

¶32. According to the FCE, the following limitations were potential barriers for Smith's returning to work: walking, forward bending, kneeling, and crouching. According to the examiner, Smith should rarely forward bend and kneel and occasionally stand and walk. Additionally, Dr. Winkelmann imposed a restriction of lifting no more than thirty pounds frequently. However, according to Lieutenant Addison, correctional officers were required to walk frequently. Moreover, they were required to sit, stand, bend at the waist, and lift up to thirty-five pounds occasionally. Additionally, Major Kaho admitted that the job required physical force. According to Smith, 80% of the job involved walking or standing, and 20% involved sitting. Smith stated he was not capable of returning to his employment because

14

he could not defend himself against a 200 or 300 pound inmate.

¶33. Furthermore, Smith established that he attempted to return to work but was refused reinstatement or rehire. *See Chestnut v. Dairy Fresh Corp.*, 966 So. 2d 868, 871 (¶5) (Miss. Ct. App. 2007) ("When the claimant has not returned to work after reaching maximum medical recovery, the claimant must establish" either that "he reported back to his employer and the employer refused to reinstate or rehire him" or "he has sought and been unable to obtain work in similar or other jobs."). Although Lieutenant Addison indicated that Smith was offered a light-duty position, Major Kaho did not know when the position was offered. According to Smith, the temporary position was offered while he was on "total work restrictions." Further, Smith claimed he attempted to return to work on at least two occasions but was unsuccessful.

¶34. Finally, Smith established that he was unable to find employment in similar or other positions. *See id.* The Employer/Carrier argues that Smith failed to make a reasonable attempt to return to the work force. However, the record indicates that Smith conducted an extensive job search and applied for numerous jobs with the help of a vocational expert. The Employer/Carrier asserts that Smith's testimony was "less than credible" and that he emphasized his restrictions to potential employers, made false allegations about job openings, and never applied for available jobs. However, as discussed, this Court does not make credibility determinations; that is the Commission's responsibility.

¶35. In this case, the presumption of total loss was not rebutted by the Employer/Carrier.

Therefore, we find that the Commission's finding that Smith sustained a 100% loss of industrial use of his right lower extremity is supported by substantial evidence.

**II.    Whether substantial evidence supports the Commission's finding that Smith sustained a compensable mental injury.**

¶36.    The Employer/Carrier claims that the Commission's finding that Smith had a compensable mental injury was not supported by substantial evidence.

¶37.    "[W]hen a claimant seeks compensation benefits for disability resulting from a mental or psychological injury, the claimant has the burden of proving by clear and convincing evidence the connection between the employment and the injury." *Fought v. Stuart C. Irby Co.*, 523 So. 2d 314, 317 (Miss. 1988).

¶38.    In October 2017, Smith began therapy sessions at Life Help. Smith reported that he had sustained a work-related injury and that he had experienced sleep issues, depression, anxiety, and thoughts about hurting himself and others. Throughout his therapy sessions, he explained he had constant pain, and he was angry that his life would never be the same. He often brought his girlfriend to therapy and reported issues with her, family conflicts, and other interpersonal problems. Smith indicated that he had anxiety a couple times per week for several years prior to the incident.

¶39.    Smith suggests that the therapy sessions themselves establish the causal connection that is required to prove his claim. We disagree. Smith did not submit any medical opinions confirming that his employment caused his mental injury. As the AJ noted, Smith's therapist never related any of his mental injuries to his employment, nor did she give Smith any work

restrictions. Smith admitted that he had anxiety prior to the incident at work. However, many of Smith's issues were related to other life stressors, such as issues with his girlfriend and family. Therefore, we reverse the Commission's finding that Smith sustained a compensable mental injury.

### III. Whether the Commission erred by affirming the AJ's separate order compelling it to pay for and provide evaluations to determine whether the placement of a spinal cord stimulator is reasonable, necessary, and related to Smith's injury.

¶40. On November 7, 2018, the AJ entered a separate order compelling authorization of medical treatment. The AJ found that "evaluations with Dr. Laseter and Dr. Koestler are reasonable, necessary and related to the claimant's work injury, and employer/carrier shall pay for and provide claimant with evaluations with Dr. Laseter and Dr. Koestler to determine whether the placement of a spinal cord stimulator is reasonable, necessary and related to [Smith's] work injury." The Employer/Carrier claims the Commission erred by affirming the AJ's order.

¶41. "The Commission sits as the finder of fact[,] and its findings are entitled to substantial deference. As a reviewing court, we may only interfere with the Commission's findings if they are arbitrary and capricious." *Richardson v. Johnson Elec. Auto. Inc.*, 962 So. 2d 146, 150 (¶10) (Miss. Ct. App. 2007) (citation omitted). "Where there is conflicting medical testimony, the Commission has the responsibility to apply its expertise and determine which evidence is more credible. We will uphold that determination unless it is clearly erroneous." *Washington v. Woodland Vill. Nursing Home*, 25 So. 3d 341, 355 (¶33)

17

(Miss. Ct. App. 2009).

¶42. We find substantial evidence to support an evaluation for a spinal stimulator. The basis for a specialty referral for a spinal stimulator evaluation was explained in detail by Dr. Winkelmann in his deposition testimony in February 2018 and recommended again in his subsequent treatment notes of September 13, 2018. Importantly, the spinal stimulator would not be used to treat the pain from Smith's thoracic-spine disk bulge even though the device is actually placed on the spine. Dr. Winkelmann testified that the device would be used to alleviate Smith's CRPS symptoms, which were confined to his lower extremity (specifically, his knee). Dr. Winkelmann explained that CRPS is "a condition where you have an injury that occurs, but your body actually starts responding to it." An area of the body becomes sensitized and has increased symptoms "of an otherwise not even particularly prominent injury."

¶43. Although Smith declined pursuing the placement of a spinal stimulator in August 2017, by the time he saw Dr. Winkelmann in September 13, 2018, Smith's lower extremity pain had persisted. Dr. Winkelmann's medical notes stated that Smith's persistent lower extremity pain was due to what "appeared to be" CRPS, which had developed since the time of the work injury in March 2016. Dr. Winkelmann again found that Smith "may be a candidate for a stimulator placement" and referred him to Drs. Laseter and Koester for a stimulator evaluation. Importantly, this recommendation was made *after* Dr. Winkelmann's deposition in February 2018, where his frequently cited testimony read that he was "not

18

"making any further recommendations to pursue . . . stimulator placement" because before that time, Smith's CRPS had been subsiding.

¶44. Admittedly, there were conflicting medical opinions concerning the helpfulness of a spinal stimulator to alleviate Smith's lower extremity pain. Dr. Winkelmann was the only physician to recommend the possible placement of the stimulator to alleviate Smith's CRPS pain. Dr. Blount, Dr. Collipp, and Dr. Katz stated that Smith did not meet the criteria for CRPS. Further, Dr. Blount and Dr. Katz stated that they did not recommend the placement of a spinal cord stimulator. However, it is well established that the Commission is charged with making case-by-case credibility determinations of the witnesses before it. *Richardson*, 962 So. 2d at 150 (¶10). Therefore, the Commission had to resolve these conflicting medical opinions.

¶45. Even though Dr. Winkelmann was the only physician who recommended the stimulator, and only to treat Smith's CRPS and not his back pain, this fact does not make offering the evaluation improper, as the separate opinion contends. Only one physician's opinion was needed to recommend an evaluation for a spinal stimulator if the Commission found his opinion credible. Just because three physicians were unsure if Smith had CRPS[4] and two of the three physicians disagreed with him about the stimulator does not make it improper to grant an evaluation under Dr. Winkelmann's recommendation. Finally, the

---

[4] Smith points out that all of his treating physicians adopted the diagnosis of RSD/CRPS.

physician evaluators will determine if Smith currently has CRPS, if the lower extremity pain relates to the work injury, and if the device will help alleviate Smith's pain. If the evaluation finds the stimulator may help, Smith will then be able to accept or reject the procedure.

¶46. Moreover, the grant of an evaluation for a spinal stimulator does not, as the separate opinion states, shift the burden of proof from Smith to the Employer/Carrier. Smith met his burden of proving his knee injury arose out of the course of employment and was causally connected to his employment. The pain possibly caused by CRPS is a secondary diagnosis. Because this syndrome is admittedly difficult to diagnose, is intermittent, and may not be a symptom of the knee injury, the AJ and Commission properly concluded that an evaluation to confirm these matters is necessary.

¶47. The evaluation itself for the efficacy of a spinal cord stimulator to alleviate Smith's long history of intermittent lower extremity pain will determine many of the unknown factors raised by the Employer/Carrier, such as if Smith has CRPS, if it is related to his lower extremity work injury, and if the placement of the stimulator will help his pain. Accordingly, the Commission's order should be affirmed on this issue and authorization/payment of the evaluations granted.

### IV. Whether the Commission erred by failing to consider the Employer/Carrier's request for apportionment or set-off credit.

¶48. The Employer/Carrier claims that the AJ and Commission erred by failing to address whether it was entitled to apportionment or set-off credit for payments related to Smith's "unrelated, pre-existing" back pain.

20

¶49. The AJ acknowledged that among the issues to be decided were ". . . whether the employer and carrier are entitled to apportionment . . . [and] whether the employer and carrier are entitled to a credit or setoff with regard to payments made to Dr. Beacham." However, it does not appear that either the AJ or the Commission decided these issues.

¶50. With respect to apportionment benefits, Mississippi Code Annotated section 71-3-7(2) (Supp. 2012), provides in relevant part:

> Where a preexisting physical handicap, disease, or lesion is shown by medical findings to be a material contributing factor in the results following injury, the compensation which, but for this subsection, would be payable shall be reduced by that proportion which such preexisting physical handicap, disease, or lesion contributed to the production of the results following the injury. The preexisting condition does not have to be occupationally disabling for this apportionment to apply.

However, "[a]pportionment may only be considered after the claimant has met its burden of establishing a causal connection between an injury and a resulting disability." *Redman Homes Inc. v. Dependents of Bennington*, 749 So. 2d 1201, 1205 (¶14) (Miss. Ct. App. 1999) (citing Vardaman, S. Dunn, *Mississippi Workmen's Compensation* § 55 (reprint 1990) (3d ed. 1982)).

¶51. Because the AJ and Commission failed to address this issue of apportionment or set off credit, we remand for further proceedings.

## CONCLUSION

¶52. After review, we find that substantial evidence supported the Commission's finding that Smith sustained a 100% loss of industrial use of his right lower extremity, and that the

21

Commission did not err in affirming the separate order of the AJ compelling the Employer/Carrier to provide evaluations to determine whether the placement of a spinal cord stimulator was reasonable, necessary, and related to Smith's injury. Therefore, we affirm in part. We find that substantial evidence did not support the Commission's finding that Smith sustained a compensable mental injury. Therefore, we reverse and render in part. Finally, because neither the AJ nor the Commission ruled on the issue of apportionment or set-off, we remand for further proceedings consistent with this opinion.

¶53. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REMANDED IN PART.**

**WESTBROOKS, McDONALD AND LAWRENCE, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. GREENLEE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J., AND McCARTY, J.**

**GREENLEE, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶54. I respectfully dissent from the majority's decision to affirm the Commission's order compelling the Employer/Carrier to provide evaluations to determine whether the placement of a spinal cord stimulator was reasonable, necessary, and related to Smith's work injury. However, I concur with the majority on the remaining issues.

¶55. On November 7, 2018, the AJ entered an order compelling authorization of medical treatment. The AJ found that "evaluations with Dr. Laseter and Dr. Koestler are reasonable, necessary and related to the claimant's work injury, and employer/carrier shall pay for and provide claimant with evaluations with Dr. Laseter and Dr. Koestler to determine whether

22

the placement of a spinal cord stimulator is reasonable, necessary and related to [Smith's] work injury."

¶56.    Our standard of review is well established. "If the Commission's order is supported by substantial evidence, this Court is bound by the Commission's determination, even if the evidence would convince us otherwise if we were the fact-finder." *Prairie Farms Dairy v. Graham*, 270 So. 3d 37, 41 (¶10) (Miss. Ct. App. 2018) (quoting *Forrest Gen. Hosp. v. Humphrey*, 136 So. 3d 468, 471 (¶14) (Miss. Ct. App. 2014)). "Because the Commission serves as the ultimate fact-finder and judge of the credibility of witnesses, we may not reweigh the evidence that was before the Commission." *Id.* (quoting *Pruitt v. Howard Indus. Inc.*, 232 So. 3d 822, 825 (¶7) (Miss. Ct. App. 2017)).

¶57.    As a general proposition, the claimant has the burden of proof. He must meet this burden by showing an accidental injury arising out of and in the course of his employment and a causal connection between the injury and the claimed disability." *Toldson v. Anderson-Tully Co.*, 724 So. 2d 399, 402 (¶12) (Miss. Ct. App. 1998) (quoting *Narkeeta Inc. v. McCoy*, 247 Miss. 65, 69, 153 So. 2d 798, 800 (1963)). Ordering the Employer/Carrier to pay for an evaluation *to determine* whether the placement of a spinal cord stimulator is related to Smith's work injury shifts the burden of proof from Smith to the Employer/Carrier.

¶58.    Furthermore, Dr. Winkelmann explained that he initially recommended the placement of a spinal cord stimulator to alleviate Smith's pain associated with CRPS. However, Dr. Blount, Dr. Collipp, and Dr. Katz stated that Smith did not meet the criteria for CRPS. Dr.

Blount and Dr. Katz further stated that they did not recommend the placement of a spinal cord stimulator. Even if Smith had CRPS, Dr. Winkelmann admitted that it is not clear why a person gets CRPS. And he could not say with certainty that only the injury to Smith's lower extremity caused the response. Therefore, substantial evidence did not support the finding that evaluations for the placement of a spinal cord stimulator were reasonable, necessary, or related to Smith's work injury.

¶59. Because I believe that the Commission erred by affirming the AJ's separate order compelling it to pay for and provide evaluations to determine whether the placement of a spinal cord stimulator is reasonable, necessary, and related to Smith's injury, I would reverse on this issue.

**CARLTON, P.J., AND McCARTY, J., JOIN THIS OPINION.**